### JAMES R. MOLONEY v. JAMES DOWS.
### THE SAME v. MYERS F. TRUETT.

Where a verified complaint alleges matter, to the truth of which, the defendant, if a witness, would be privileged from testifying, an answer denying such allegations, may be served without being verified.

If the right to serve an unverified answer be disputed, the question may be brought before the court for determination by a motion for judgment, as upon a failure to answer.

On such a motion, the defendant is not required to show that the *direct* effect of admitting the truth of the matter charged would be to subject him to punishment or liability; it is sufficient that it might have that tendency; nor is it essential to be shown how it would or might subject him to prosecution or punishment.

The inquiry is excluded when it appears that the object is to procure an admission of the party that he has been guilty of an act punishable as a crime, unless an indictment for it would be barred by the statute of limitations; when, if the matter is material, the party may be required to answer.

It *seems*, that if a witness or party has been pardoned for an offence, he is privileged from answering respecting it.

So *held*, where the defendant, without leave of the court, served an unverified answer, containing a general denial of a sworn complaint, charging the defendant with having committed a series of crimes; the action being to recover damages for the injuries to the plaintiff, which were alleged to be the direct result of the crimes specified.

APPEAL from an order made at special term, held by Judge

HILTON, denying a motion on the part of the plaintiff for judgment, as upon a failure to answer.

The action arose out of the proceedings of the so-called Vigilance Committee of San Francisco, in California. The peculiar nature of the suit, and the questions presented, seem to justify inserting the entire complaint, which was as follows:

"That from on or about the twenty-eighth day of February, 1849, to the present time, the plaintiff has been a good and reputable citizen of the state of California, and an actual inhabitant and resident of said state, from the said twenty-eighth day of February, 1849, to the fifth day of July, 1856, and has only been by violence excluded from the said state, as hereinafter appears. That on or about the 15th day of May, 1856, the defendant, James Dows, William T. Coleman and Eugene Dellessert, Isaac Bluxonie, J. P. Manson, Thomas J. L. Surdey, Charles Doane, James V. Olney, R. M. Jesup, N. A. Arrington, George R. Ward, J. D. Farwell, William Arrington, J. H. Fish, H. S. Brown, Thompson William Rogers, Charles L. Case, William H. Tillinghast, J. W. Brittain, Chauncey J. Dempster, U. P. Hutchins, L. Bossange, Emile Grisar, Jules David, Joseph P. Emery, Calvin Nutting, H. Tubbs, E. B. Goddard, Aaron Burns, C. V. Gillespie, J. R. Osgood, —— Gorham, F. W. Page, Henry M. Hale, Edward P. Frank, Ernest Seyd, Myers F. Turett, —— Burke, —— Crary, John L Durkee and Charles E. Rand, as the plaintiff is informed and believes, and divers other persons to the plaintiff unknown, at San Francisco, in the state of California, wickedly and maliciously conspired and combined together to put to death unlawfully one James P. Casey, and to indemnify each other and their aiders and abettors for so doing; and to resist all courts and officers of law, who should seek to hold them accountable therefor; and to commit such other crimes and offences as such resistance to the law might involve, or the giving of a public color or motive to their acts might suggest or occasion. That the said conspirators thereupon assumed the name and style of "The Vigilance Committee of San Francisco," and suddenly, and in surprise of the authorities and peaceable

Moloney v. Dows.

citizens, seized all the arms that could be found, and organized bands of armed men who obeyed their will and direction; and therewith, on or about the 18th day of May, 1856, broke open the prison belonging to the regular constituted authorities at San Francisco, overcoming the guards by threats and violence, and seized said James P. Casey, who was then confined as a prisoner there, awaiting trial; and also wantonly, or to give a less personal color to their acts, seized one Charles Cora, there likewise a prisoner, who had once been subjected to a lawful trial, and from failure of a verdict was awaiting another trial, and put the said Casey and Cora to death by hanging in the public street. That after such acts and doings, as last aforesaid, the said defendant and his confederates did not abandon or dissolve their said unlawful and violent organization and conspiracy, but, to deter the authorities from lawful action in the premises, and keep alarm and confusion as a cover for their unlawful conduct, and by false pretences of necessity and danger give color to the same, they, the said defendant and his confederates, seized and fortified as a fort a certain building on an insulated block of ground in the city of San Francisco, and set watches, sentries and guards, and kept organized, and under orders and control, bands of armed men and artillery forces, unlawfully, and with force, visited and searched houses and dwellings of citizens, and arrested and imprisoned their persons at their will, deterring or overcoming resistance with threats and violence, inflicting imprisonment, exile, and even death, upon those they saw fit; or who were obnoxious or dangerous to their said conspiracy, without legal trial, and sometimes without pretence of trial of any kind. That on or about the 2d day of June, 1856, and from thence continually, so long as the plaintiff remained in California, the said defendant and his said confederates were called upon, solicited and required by J. Neely Johnson, the governor of the state of California, to desist from and abandon their said violent and unlawful organization and conspiracy, and their interruption of and resistance to the legal authorities; but they, the said defendant and his said confederates, wantonly and

wickedly refused so to do. That thereupon on or about the 2d day of June, 1856, J. Neely Johnson, who then was, and has since continued, and now is governor of the state of California, issued his proclamation, calling upon and requesting all the citizens of the said state to enroll themselves in the militia of the state, and to aid the government, as bound by law, in subduing the said insurrectionary conspiracy, and restoring peace and order at San Francisco aforesaid. That thereupon, in pursuance of and in obedience to the said proclamation, the said plaintiff, on or about the 2d day of June, 1856, enlisted, and was enrolled in the said militia of the state, in Company A., under the command of Richard P. Ashe, acting as captain in such militia by duly constituted authority. That on or about the 19th day of June, 1856, the said J. Neely Johnson, governor of the said state, issued, and caused to be presented to General John E. Wool, commanding the United States' forces in California, his requisition for certain arms, the property of the state of California, then in the possession or under the control of the said general, and to be furnished by him, in accordance with such requisition and request, for the service of the said state of California. That such proceedings were had in furtherance of such requisition; that the said arms were duly furnished by the said General Wool, for the purposes of such requisition; and were, on or about the 19th day of June, 1856, duly placed in the charge of the said plaintiff, to be conveyed to San Francisco, for the service of the said state, pursuant to the direction and requisition of the said governor, as aforesaid; that during all the said last mentioned proceedings, the said plaintiff was active and efficient on behalf of the said governor, and the people and lawful authorities of the said state, in the endeavors, by lawful means, to subdue the said violent and insurrectionary conspiracy of the said defendant and his confederates, and was regarded by them with resentment and apprehension because of his zeal and efficiency in the premises; and hereupon the plaintiff shows that in view of the premises, and for the causes and motives in this count mentioned, and no other, and on or about

the 20th day of June, 1856, the said defendant and his confederates, so calling themselves the " Committee of Vigilance " as aforesaid, fearing the activity of the plaintiff in the premises, wickedly and maliciously conspired and combined together violently to seize the said arms of the state, so in the plaintiff's possession or charge as aforesaid, to assault, injure, and abuse the plaintiff, and finally, to crush and 'destroy him, and put him out of their way, unless he would make terms of submission to them. That in pursuance of such last mentioned wicked and malicious conspiracy, on or about the 21st day of June, 1856, in the night time, while he, the said plaintiff, with the said arms in his possession or charge, then and there, on board a certain schooner called the Julia, then being in or near San Pablo Bay, on the high seas, between Benicia and San Francisco, he, the said defendant and his confederates, caused the said vessel to be broken in upon, and the said arms seized and carried away, and the person of the plaintiff to be assaulted and seized with force and violence by certain armed men, to wit:—John L. Durkee and Charles E. Rand, and others to the plaintiff unknown, and caused the said plaintiff to be made and kept a prisoner by such armed men, and exposed to apprehension and fear of his life, and carried and conveyed as such prisoner to San Francisco, and there publicly exposed and exhibited as a prisoner, being imprisoned and kept as a prisoner for about five hours, and then discharged him, pretending no complaint against him or ground of detention. That afterwards, on the same 21st day of June, 1856, in pursuance of their said unlawful, corrupt, and malicious conspiracy against the plaintiff, they, the said defendant and his co-conspirators, gave order for the immediate arrest and imprisonment of the said plaintiff, and then and there caused the plain·tiff to be assaulted by one Sterling A. Hopkins, an armed agent and instrument of the said defendant and his said confederates, accompanied or aided by other agents of the said conspiracy acting in his aid, in order again to deprive the plaintiff of his liberty, and remove and imprison him. And the plaintiff, to escape such violence and imprisonment, having fled to a certain

armory of the state of California, at San Francisco aforesaid, he, the said defendant and his said confederates and co-conspirators, caused armed men to assemble around the said armory, with cannon pointed against the doors thereof, and by demonstrations of force, and threats of extreme violence, to again obtain possession of the plaintiff's person, and deprive him of his liberty; thereupon, by such armed men, acting under the orders of the said defendant and his co-conspirators, the said plaintiff was again assaulted and seized, and imprisoned in a dungeon held and used by the said conspirators, and kept a close prisoner from the 21st day of June, 1856, to the 5th day of July, 1856; they, the said defendant and his co-conspirators, concealing the plaintiff's person in the meantime from the United States' marshal, who had been and was seeking to execute a writ of *habeas corpus* for the body of the plaintiff, by removing his person from one place of confinement to another, while said marshal was seeking the plaintiff to serve such writ, and evading and misleading the said marshal so as to evade and defeat such process; and finally, on or about the 4th day of July, 1856, the defendant and his co conspirators, in pursuance of their said wicked and malicious conspiracy against the said plaintiff, and with the intent finally to remove and subdue, and effectually destroy him, wickedly and maliciously agreed together to have the said plaintiff abducted, carried off, and forever exiled from the said state of California, and that he should be put to immediate death in case he should ever return to the said state; and all explanation or satisfaction to the plaintiff, as to the grounds or pretext for such cruel and arbitrary treatment, and all facilities to the plaintiff for examining his books and accounts, arranging his business, and communicating with his friends and agents, so as to save and prevent what loss and damage he could of that which must necessarily and did accrue from his sudden removal and abduction from California, was then and there arbitrarily, wantonly, wickedly and maliciously refused to the plaintiff; and thereupon afterwards, to wit, on the next day, being the 5th day of July, 1856, in pursuance of the said unlawful, wicked and malicious conspira-

cy, the said defendant and his said co-conspirators caused the said plaintiff to be assaulted, seized and taken by armed men, the agents of the said conspiracy, and members thereof, and carried to a certain wharf at San Francisco aforesaid, and to and on board of a certain steamer, called the John L. Stephens, then there lying and being, and on such steamer to be abducted, kidnapped, exiled and banished from the said state of California; that the said steamer, with the said plaintiff, thus by force and violence, and against his will, in and on board thereof, did leave San Francisco for Panama, in the state of New Grenada, very shortly after the plaintiff was thus violently and forcibly put on board thereof, on the said 5th day of July, 1856; the last action of the said defendant and his said co-conspirators as to the said plaintiff, before the leaving of the said steamer, being that a certain member of the said conspirators, affecting and burlesquing all the forms and ceremonies of the most august and regular tribunal, summoned the plaintiff on board the said steamer, and reannounced to him, producing certain papers as the acts or process of such mock-tribunal, that he, the plaintiff, was banished from California, never to return under the severest penalties, (i.e.,) " death; " that the said defendant and his co-conspirators had bodies of armed men, in great numbers, arrayed on the wharf where said steamer lay, to carry out their arbitrary sentence and orders, and defeat all rescue by citizens or duly constituted officers of the courts of California; and by means of the said conspiracy, and by the violence and force aforesaid, the said plaintiff was then and there abducted and exiled from the state of California, and has since continued exiled and excluded therefrom, being notified and solemnly warned that the said wicked conspirators have agreed and resolved, and mutually bound and pledged themselves to each other to put the plaintiff to death at once, in case of his return to California; all which last mentioned outrages and monstrous acts of the said defendant and his co-conspirators were wantonly wicked, corrupt and malicious, to the great grief and affliction, damage and injury of the plaintiff, and the destruction of his individual rights, and to the great

scandal and disgrace of all civil government and authority at San Francisco aforesaid, and whereby, and by means of which last mentioned wrongs, grievances and outrages, the plaintiff has been not only greatly injured in person and health, and humiliated, afflicted and distressed in mind and feelings, but has been degraded and blasted in character and position, and broken up and crushed in his business, property, interest, credit, circumstances, plans, prospects and arrangements; deprived of his home and accustomed means of support, livelihood and occupation, and the future of his life destroyed.

And the plaintiff further shows and alleges to the Court, in connection with the claim for damages hereinafter set forth, for and by reason of the wrongs, oppression and grievances hereinbefore stated, that the said conspiracy, calling itself " The Vigilance Committee," pretending its proceedings to be necessary for the public good, and to be for that object, was, in fact, unjust, unnecessary and mischievious, the result of personal passion, rage, malice, arrogance, tyranny in its origin, and was afterwards most wantonly, mischievously and dangerously continued in its operations; partly from the same motives with which it commenced; partly from the fear of the parties that if they abandoned their armed, organized and alarming position, they would be promptly held to legal accountability; and partly to give a color of public motives to their conduct; that, nevertheless, the said defendant and his co-conspirators have, from the beginning of the said proceedings, wantonly and maliciously seeking thereby to cover and color their own monstrous and oppressive conduct, given out, and caused to be proclaimed to the public, in numerous organs of publicity controlled by them, (without being able, or daring to specify any particular alleged offence), that the plaintiff was a notorious criminal and offender, and a worthless, disreputable character, they well knowing the contrary. That Sterling A. Hopkins, hereinbefore mentioned, was employed to assault, arrest and imprison the plaintiff, by the defendant and his co-conspirators; was an executioner or hangman of the said conspirators; that the plaintiff, while held

Moloney v. Dows.

a prisoner by the defendant and his co-conspirators, was con-fined in a cell, and subjected to jeers, contumely and insult; was twice hand-cuffed and put in irons, and led to-and-fro by armed men, exciting his apprehensions that he was being led to death, his inquiries as to what was to be done with him being unheeded and unanswered, was under just apprehension of being poisoned in his food, or put to death in some other secret way; was arbitrarily deprived of the reading of public journals of his own choice and selection; was removed from one place of im-prisonment to another. That while the said plaintiff was so un-lawfully in prison, he was subjected to insulting visits and in-terrogatories on the part of the said conspirators, with armed guards constantly standing at the door of his cell night and day; and, after operations to excite or increase the plaintiff's appre-hension of further violence, such insulting and alarming visits, interrogatories, and inquisition to the plaintiff, in his cell, were renewed: they, the said conspirators, seeking by the operation of imprisonment, threats, and fear, to obtain from the plaintiff disclosures and information, aid and facilities for the prosecution of violent designs.

That the plaintiff, during his residence of many years in Cali-fornia, and up to the time of his abduction, was, and had been largely engaged in business, trade, and operations; and had property and pecuniary interests, exclusive of debts owing to him, unsettled, and unclosed or disposed of, to a large amount, which business, property, interests and operations, by his said sudden imprisonment and banishment, have been greatly, if not totally and irretrievably damaged and lost; that he had, when he left California, a large amount of debts due him, which have been, as he believes, wholly lost by reason of the actions of the said defendant and his co-conspirators, to the extent of from seven to ten thousand dollars, as he believes; that he had, as naval store-keeper at San Francisco, (an office held by him for about a year), an unsettled account with the United States gov-ernment, which, by the wilful conduct of the defendant and his confederates, he was prevented from settling, to his great loss

and damage. That the said defendant and his co-conspirators, during all his said imprisonment, refused to communicate to him any explanation of their outrageous conduct, or any charge, accusation, or complaint, or to give him any trial or examination; that they also wantonly and maliciously refused to the plaintiff all reasonable facilities to enable him to lighten or guard against losses in his business by examination of his books and accounts, and communication with friends or agents; and that finally, on occasion of the actual abduction and exile of the plaintiff, against which the plaintiff always indignantly complained and remonstrated, and so far as he could, without inviting further violence, resisted, they, the said defendant and his co-conspirators, well knowing and mocking his feelings, required and insisted that he, the plaintiff, should sign a paper requesting substantially, or, as they meant and intended to construe it, his own abduction, under threats of deporting him to some distant island in the Pacific, where he could with great difficulty and delay, if ever, return, in case of his refusal; that the plaintiff long resisted compliance with such wanton, insulting, tyrannical requisition, but, from force and duress, and apprehension of further violence, finally signed such paper, being advised, and believing such proceeding, under the circumstances, to be empty, void and nugatory, for any purpose beneficial to the said conspirators, or prejudicial to the plaintiff. For all which wrongs and grievances hereinbefore set forth, the said plaintiff prays judgment for damages against the said defendant, for and by reason of the premises, for the sum of one hundred thousand dollars, besides costs."

The usual verification was attached.

The defendant served an unverified answer, denying generally "each and every allegation in the complaint," which was immediately returned, with a statement that it would not be accepted because no verification was attached. The plaintiff then moved, upon notice, for judgment as on a failure to answer. The motion was denied, and the plaintiff appealed. The proceedings were alike in each case.

Moloney v. Dows.

*George Bowman*, for the appellant.

*Jeremiah Larocque*, for the respondent.

By the court, DALY, First Judge.—The verification of an answer may be omitted where the defendant, if a witness, would be privileged from testifying as to the truth of any matter alleged in the complaint (Laws of 1854, p. 153) and denied by the answer. The complaints in these cases charge the defendants with having committed a series of crimes, and there can be no doubt that, if they were under examination as witnesses, they would be privileged from answering as to many of the matters alleged in the complaints.

It is insisted, however, that a defendant cannot put in an unverified answer to a sworn complaint until he has satisfied the court that it might expose him to a prosecution for a crime to verify it, or subject him to a penalty. That he must first move the court upon an affidavit declaring that such would or might be the effect if he were compelled to verify. That he must, by bringing the matter before the court in the form of an affidavit, place himself in a position somewhat analogous to that of a witness under examination, that it may be left to the court to decide whether he must verify his answer or not—as it is not for him to determine whether he would be privileged, as a witness, from testifying to the truth of the matter denied by his answer.

The 154th section of the Code, and the act of 1854, are both founded upon a familiar principle in the law, that no one can be compelled to accuse himself of crime, or to disclose anything that may have a tendency to expose him to a prosecution upon a criminal charge, or to any kind of punishment, or even to a penal liability. 1 Greenleaf's Evid., § 451. It is not necessary that such should be the direct effect; it is enough if it would or might lead to criminal proceedings against him. *Bellinger* v. *The People*, 8 Wend. 595. If it would furnish one link in a chain of circumstances that would convict him, he need not answer. 1 Burr's Trial, 244; *Paxton* v. *Douglass*, 16 Ves. 242.

Or, if he declares that he cannot answer without subjecting him-self to criminal liability, he cannot be required to show how or in what way it would have that effect. *People* v. *Mather,* 4 Wend. 229; *Paxton* v. *Douglass, supra.*

This privilege is not confined to a witness on the stand, but extends to a party in every stage of a case.    Thus, in a court of equity it is well settled that no man need discover matters tend-ing to criminate himself, or to expose him to a penalty or for-feiture; so that if a bill charges anything which, if confessed by the answer, may or might have a tendency to subject the de-fendant to a criminal prosecution, or to a penalty, he may claim his protection by demurring to so much of the bill.    *East India Company* v. *Campbell,* 1 Ves., sr., 246; *Chetwynd* v. *Lindon,* 2 id. 450; *Brownsword* v. *Edward,* id. 243; *Parkhurst* v. *Lowten,* 2 Swanst. 214; *Cartwright* v. *Green,* 8 Ves., jr., 405; *Skinner* v. *Judson,* 8 Conn. 521; *March* v. *Davidson,* 9 Paige, 580; Adams' Doctrine of Equity, 2; 2 Daniel's Chancery Practice, 46.    Or, if the objectionable disclosure is not apparent upon the face of the bill, he may raise the objection by plea, as in *Claridge* v. *Hoare,* (14 Ves. 59), where it is said, "If a bill states a marriage with a particular woman, the defendant may plead that she is his sister, and refuse to state anything more, or to speak as to any one fact forming a link in the chain."    So, where a witness in equity is examined upon interrogations, he may refuse to answer any question tending to criminate him, or to subject him to a pen-alty, and his objection comes up in the form of a demurrer alleging the reason or grounds of the witness' objection, which, if denied, must be supported by an affidavit.    Gresley's Equity Evidence, 77; *Parkhurst* v. *Lowten,* 3 Madd. 121.    In every case, therefore, at law or in equity, in which a witness or a party claimed the protection afforded by this general rule, the question of his privilege was one for the determination of the court, and was brought before it either by an objection raised on the wit-ness' behalf at the trial, or by the defendant's demurring to the discovery sought by the bill, or where it could not be raised by a demurrer to the bill, by bringing it before the court in the

form of a plea; or where a witness was examined out of court, by an instrument in writing, transmitted to the court by the officer before whom the witness was under examination, stating the grounds of his objection, accompanied by the proofs, if the reasons or grounds given by the witness were denied. Gresley's Equity Evidence, by Calvert, 77, note *f.* The question whether the party or the witness was privileged, came up in some shape to enable the court to determine judicially upon its validity. It was never left to the election or determination of the party, or of the witness.

Has this course of procedure been abrogated by the act of 1854, and the previous enactments in the Code? The act is very brief. It simply declares that "the verification of any pleading, in any court of record in this state, may be omitted in all cases where the party called upon to verify would be privileged from testifying as a witness to the truth of any matter denied by such pleading."

A provision substantially similar to this was incorporated in the Code when first enacted in 1848, (§ 133), that " the verification may be omitted when the party would be privileged from testifying as a witness to the same matter." It was stricken out at the amendment of the Code in the following year, and in the amendment of 1851 the provision in the Code, as it exists at present, was inserted—"that the verification may be omitted when an admission of the truth of the allegations might subject the party to a prosecution for felony," which was modified afterwards by the special statute of 1854, above referred to, bringing things back very much to what they were seven years before, when the Code was first enacted. During this course of varying and inconstant legislation, this ever-changing and shifting provision underwent judicial construction in a number of cases: *Hill* v. *Muller*, 2 Sandf. 684; *White* v. *Cummings*, 3 id. 716; *Clapper* v. *Fitzpatrick*, 3 How. 314; *Thomas* v. *Hanop*, 7 id. 57; *Springstead* v. *Robinson*, 8 id. 141; *Scoville* v. *New*, 12 id. 319; *Lynch* v. *Todd*, 13 How. 548; *Blaisdell* v. *Raymond*, 5 Abbott, 144.

It would be unprofitable to review these cases, as the act of

1854 must be regarded as controlling all the previous legislation, and it alone must be looked to in determining what is now the proper practice. It makes provision only for the service of an unverified answer where the defendant, by his answer, denies some matter in the complaint, in respect to the truth of which he could not be interrogated if he was under examination as a witness. The matter, averment, or fact in the complaint, denied by the answer, will be indicated by the complaint and answer, and if it is not of a character to justify the service of an unverified answer, the plaintiff has an easy remedy. He may move the court, as has been done in this case, for judgment for want of a sufficient answer, which, I suppose, would be his proper course; or, if he should enter judgment for want of an answer, the question could come before the court upon the defendant's motion to set the judgment aside. The question could not, as was the former practice in equity, be brought before the court by a demurrer, for the Code has defined the cases in which a defendant may demur, and this is not one of them. The only course for a defendant, therefore, under this act, where something is alleged in the complaint which he could not be interrogated upon if he was a witness, and which it is material he should put in issue, is to deny it by his answer, and serve his answer without verifying it. If it is not of the character supposed, the plaintiff's motion for judgment will bring the question as effectually before the court as it was brought under the old equity practice, by a demurrer to so much of the bill. If the question of privilege is of such a nature that it would not appear by a mere denial of the averments in the complaint, then the act of 1854 has made no provision for such a case, and the old equity practice would prevail. The defendant would have to put in a verified answer, setting forth, analogous to the former plea in equity, the grounds or reasons why he is excused from answering any of the averments in the complaint, and if there is no validity in the reason or grounds assigned by him, the plaintiff, as before, may move for judgment for want of a sufficient answer. In either case, upon the service of an unverified answer,

or an answer verified, but assigning grounds why certain aver-ments in the complaint should not be answered, the plaintiff, by a motion for judgment, can take the sense of the court as to the defendant's right not to answer certain averments, or to serve an unverified answer. He can raise the question as effectually in this way as he could by the course of proceeding that was in use under the former equity practice.

In these cases the defendants denied the averments in the complaints, and served their answers without verifying them. They adopted, in my judgment, the proper course, and on this motion for judgment it is sufficient to say, that there were aver-ments in the complaints of a character that entitled the defend-ants to serve their answers without verifying them. The whole scope and tendency of the acts attributed to them is to show that they were guilty of crimes and misdemeanors. To use the language of the court in *Skinner* v. *Judson*, 8 Conn. Rep. 529, " a defendant is protected from making answer when the allegations of a bill state many facts, each and all of which have a joint or united tendency to bring him within the penalty of the law."

It is suggested that the defendants may have been pardoned, or tried and acquitted, or absolved from liability by lapse of time, or by a legislative act of amnesty, and that unless some proof is submitted, the court cannot assume that they are liable to punishment even if they have committed the acts attributed to them in the complaint. This suggestion might have been made with equal force against the former equity practice of allowing a defendant to demur to so much of a bill as imputed to him, or charged him with having committed a crime, and yet that practice was well settled. It is not necessary, as before re-marked, that the direct effect will, or would, be to subject the party to punishment or to liability. It is sufficient that it may, or might, have that tendency, and neither a defendant nor a wit-ness can be required to show how it would, or might, subject him to prosecution or punishment. The inquiry is totally barred the moment that it is apparent to the court that the object of it

is to obtain from the defendant or the witness an admission that he has been guilty of an act punishable as a crime ; unless the interrogators refer to an act, an indictment for which would be barred by the statute of limitations, (*Roberts* v. *Abbott,* 1 Moody & Malkin, 192 ; *People* v. *Mather,* 4 Wend. 255,) when, if the inquiry were material, the party interrogated would be bound to answer. Even where a witness has been pardoned for the offence, he is privileged from answering respecting it. *Rex* v. *Reading,* 7 Howell's State Trials, 296; *Rex* v. *Earl of Shrewsbury,* 8 id.

Order appealed from affirmed.