# BROWN *v.* WALKER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 765. Argued January 23, 1896. — Decided March 23, 1896.

The provision in the act of February 11, 1893, c. 83, 27 Stat. 443, "that no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements, and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture: but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding," affords absolute immunity against prosecution, Federal or state, for the offence to which the question relates, and deprives the witness of his constitutional right to refuse to answer.

THIS was an appeal from an order of the Circuit Court, made upon the return of a writ of *habeas corpus,* remanding the petitioner Brown to the custody of the marshal, the respondent in this case.

It appeared that the petitioner had been subpœnaed as a witness before the grand jury, at a term of the District Court for the Western District of Pennsylvania, to testify in relation to a charge then under investigation by that body against certain officers and agents of the Allegheny Valley Railway Company, for an alleged violation of the Interstate Commerce Act. Brown, the appellant, appeared for examination, in response to the subpœna, and was sworn.    After testifying that he was auditor of the railway company, and that it was his duty to audit the accounts of the various officers of the company, as well as the accounts of the freight department of such company during the years 1894 and 1895, he was asked the question:

"Do you know whether or not the Allegheny Valley Railway Company transported for the Union Coal Company, during the months of July, August and September, 1894, coal from any point on the Low Grade division of said railroad company to Buffalo at a less rate than the established rates in force between the terminal points at the time of such transportation?"

To this question he answered:

"That question, with all respect to the grand jury and yourself, I must decline to answer for the reason that my answer would tend to accuse and incriminate myself."

He was then asked:

"Do you know whether the Allegheny Valley Railway Company during the year 1894, paid to the Union Coal Company any rebate, refund or commission on coal transported by said railroad company from points on its Low Grade division to Buffalo, whereby the Union Coal Company obtained a transportation of such coal between the said terminal points at a less rate than the open tariff rate or the rate established by said company? If you have such knowledge, state the amount of such rebates or drawbacks or commissions paid, to whom paid, the date of the same, and on what shipments; and state fully all the particulars within your knowledge relating to such transaction or transactions."

Answer.    "That question I must also decline to answer for the reason already given."

The grand jury reported these questions and answers to the court, and prayed for such order as to the court might seem meet and proper. Upon the presentation of this report, Brown was ordered to appear and show cause why he should not answer the said questions or be adjudged in contempt; and upon the hearing of the rule to show cause, it was found that his excuses were insufficient, and he was directed to appear and answer the questions, which he declined to do. Whereupon he was adjudged to be in contempt and ordered to pay a fine of five dollars, and to be taken into custody until he should have answered the questions.

He thereupon petitioned the Circuit Court for a writ of *habeas corpus*, stating in his petition the substance of the above facts. The writ was issued, petitioner was produced in court, the hearing was had, and on the eleventh day of September, 1895, it was ordered that the petition be dismissed, the writ of *habeas corpus* discharged, and the petitioner remanded to the custody of the marshal. 70 Fed. Rep. 46.

From that judgment Brown appealed to this court.

*Mr. James C. Carter* for appellant.

*Mr. George F. Edmunds* for appellee.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

This case involves an alleged incompatibility between that clause of the Fifth Amendment to the Constitution, which declares that no person " shall be compelled in any criminal case to be a witness against himself," and the act of Congress of February 11, 1893, c. 83, 27 Stat. 443, which enacts that " no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, . . . on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture.

But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding."

The act is supposed to have been passed in view of the opinion of this court in *Counselman* v. *Hitchcock*, 142 U. S. 547, to the effect that section 860 of the Revised Statutes, providing that no evidence given by a witness shall be used against him, his property or estate, in any manner, in any court of the United States, in any criminal proceeding, did not afford that complete protection to the witness which the amendment was intended to guarantee. The gist of that decision is contained in the following extracts from the opinion of Mr. Justice Blatchford, (pp. 564, 585,) referring to section 860: "It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted." And again: "We are clearly of opinion that no statute which leaves the party or witness subject to prosecution, after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecutions for the offence to which the question relates."

The inference from this language is that, if the statute does afford such immunity against future prosecution, the witness will be compellable to testify. So also in *Emery's*

*case*, 107 Mass. 172, 185, and in *Cullen* v. *Commonwealth*, 24 Gratt. 624, upon which much reliance was placed in *Counselman* v. *Hitchcock*, it was intimated that the witness might be required to forego an appeal to the protection of the fundamental law, if he were first secured from future liability and exposure to be prejudiced, in any criminal proceeding against him, as fully and extensively as he would be secured by availing himself of the privilege accorded by the Constitution. To meet this construction of the constitutional provision, the act in question was passed, exempting the witness from any prosecution on account of any transaction to which he may testify. The case before us is whether this sufficiently satisfies the constitutional guaranty of protection.

The clause of the Constitution in question is obviously susceptible of two interpretations. If it be construed literally, as authorizing the witness to refuse to disclose any fact which might tend to incriminate, disgrace or expose him to unfavorable comments, then as he must necessarily to a large extent determine upon his own conscience and responsibility whether his answer to the proposed question will have that tendency, 1 Burr's Trial, 244; *Fisher* v. *Ronalds*, 12 C. B. 762; *Reynell* v. *Sprye*, 1 De Gex, McN. & G. 656; *Adams* v. *Lloyd*, 3 H. & N. 351; *Merluzzi* v. *Gleeson*, 59 Maryland, 214; *Bunn* v. *Bunn*, 4 De Gex, J. & S. 316; *Ex parte Reynolds*, 20 Ch. Div. 294; *Ex parte Schofield*, 6 Ch. Div. 230, the practical result would be, that no one could be compelled to testify to a material fact in a criminal case, unless he chose to do so, or unless it was entirely clear that the privilege was not set up in good faith. If, upon the other hand, the object of the provision be to secure the witness against a criminal prosecution, which might be aided directly or indirectly by his disclosure, then, if no such prosecution be possible — in other words, if his testimony operate as a complete pardon for the offence to which it relates — a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause in question.

Our attention has been called to but few cases wherein this provision, which is found with slight variation in the constitu-

tion of every State, has been construed in connection with a statute similar to the one before us, as the decisions have usually turned upon the validity of statutes providing, as did section 860, that the testimony given by such witness should never be used against him in any criminal prosecution. It can only be said in general that the clause should be construed, as it was doubtless designed, to effect a practical and beneficent purpose — not necessarily to protect witnesses against every possible detriment which might happen to them from their testimony, nor to unduly impede, hinder or obstruct the administration of criminal justice. That the statute should be upheld, if it can be construed in harmony with the fundamental law, will be admitted. Instead of seeking for excuses for holding acts of the legislative power to be void by reason of their conflict with the Constitution, or with certain supposed fundamental principles of civil liberty, the effort should be to reconcile them if possible, and not to hold the law invalid unless, as was observed by Mr. Chief Justice Marshall, in *Fletcher* v. *Peck*, 6 Cranch, 87, 128, "the opposition between the Constitution and the law be such that the judge feels a clear and strong conviction of their incompatibility with each other."

The maxim *nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier

state trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment.

Stringent as the general rule is, however, certain classes of cases have always been treated as not falling within the reason of the rule, and, therefore, constituting apparent exceptions. When examined, these cases will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness, the rule ceases to apply, its object being to protect the witness himself and no one else — much less that it shall be made use of as a pretext for securing immunity to others.

1. Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure. 1 Greenl. Ev. § 451.; *Dixon* v. *Vale*, 1 C. & P. 278; *East* v. *Chapman*, 2 C. & P. 570; *S. C.* M. & M. 46; *State* v. *K——*, 4 N. H. 562; *Low* v. *Mitchell*, 18 Maine, 372; *Coburn* v. *Odell*, 10 Fost. (N. H.) 540; *Norfolk* v. *Gaylord*, 28 Connecticut, 309; *Austin* v. *Poiner*, 1 Sim. 348; *Commonwealth* v. *Pratt*, 126 Mass. 462; *Chamberlain* v. *Willson*, 12 Vermont, 491 ; *Lockett* v. *State*, 63 Alabama, 5; *People* v. *Freshour*, 55 California, 375.

So, under modern statutes permitting accused persons to

take the stand in their own behalf, they may be subjected to cross-examination upon their statements. *State* v. *Wentworth*, 65 Maine, 234; *State* v. *Witham*, 72 Maine, 531 ; *State* v. *Ober*, 52 N. H. 492; *Commonwealth* v. *Bonner*, 97 Mass. 587; *Commonwealth* v. *Morgan*, 107 Mass. 199; *Commonwealth* v. *Mullen*, 97 Mass. 545; *Connors* v. *People*, 50 N. Y. 240; *People* v. *Casey*, 72 N. Y. 393.

2. For the same reason if a prosecution for a crime, concerning which the witness is interrogated, is barred by the statute of limitations, he is compellable to answer. *Parkhurst* v. *Lowten*, 1 Merivale, 391, 400; *Calhoun* v. *Thompson*, 56 Alabama, 166; *Mahanke* v. *Cleland*, 76 Iowa, 401; *Weldon* v. *Burch*, 12 Illinois, 374; *United States* v. *Smith*, 4 Day, 121; *Close* v. *Olney*, 1 Denio, 319; *People* v. *Mather*, 4 Wend. 229, 252–255; *Williams* v. *Farrington*, 11 Cox Ch. R. 202; *Davis.* v. *Reid*, 5 Sim. 443; *Floyd* v. *State*, 7 Tex. 215; *Maloney* v. *Dows*, 2 Hilt. 247; *Wolfe* v. *Goulard*, 15 Abb. Pr. 336.

3. If the answer of the witness may have a tendency to disgrace him or bring him into disrepute, and the proposed evidence be material to the issue on trial, the great weight of authority is that he may be compelled to answer, although, if the answer can have no effect upon the case, except so far as to impair the credibility of the witness, he may fall back upon his privilege. 1 Greenl. on Ev. §§ 454 and 455; *People* v. *Mather*, 4 Wend. 229; *Lohman* v. *People*, 1 N. Y. 379 ; *Commonwealth* v. *Roberts*, Brightly, 109; *Weldon* v. *Burch*, 12 Illinois, 374; *Cundell* v. *Pratt*, Moody & Malkin, 108; *Ex parte Rowe*, 7 California, 184. But even in the latter case, if the answer of the witness will not directly show his infamy, but only *tend* to disgrace him, he is bound to answer. 1 Greenl. on Ev. § 456. The cases of *Respublica* v. *Gibbs*, 3 Yeates, 429, and *Lessee of Galbreath* v. *Eichelberger*, 3 Yeates, 515, to the contrary, are opposed to the weight of authority.

The extent to which the witness is compelled to answer such questions as do not fix upon him a criminal culpability is within the control of the legislature. *State* v. *Nowell*, 58 N. H. 314, 316.

4. It is almost a necessary corollary of the above propositions that, if the witness has already received a pardon, he cannot longer set up his privilege, since he stands with respect to such offence as if it had never been committed. *Roberts* v. *Allatt*, Moody & Malkin, 192, overruling *Rex* v. *Reading*, 7 How. St. Tr. 259, 296, and *Rex* v. *Earl of Shaftsbury*, 8 How. St. Tr. 817; *Queen* v. *Boyes*, 1 B. & S. 311, 321. In the latter case it was suggested, in answer to the production by the Solicitor General of a pardon of the witness under the Great Seal, that by statute, no such pardon under the Great Seal was pleadable to an impeachment by the Commons in Parliament, and it was insisted that this was a sufficient reason for holding that the privilege of the witness still existed, upon the ground that, though protected by the pardon against every other form of prosecution, the witness might possibly be subjected to parliamentary impeachment. It was also contended in that case, as it is in the one under consideration, "that a bare possibility of legal peril was sufficient to entitle a witness to protection. Nay, further, that the witness was the sole judge as to whether his evidence would bring him into the danger of the law; and that the statement of his belief to that effect, if not manifestly made *mala fide*, would be received as conclusive." It was held, however, by Lord Chief Justice Cockburn that "to entitle a party called as a witness to the privilege of silence, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer," although "if the fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any particular question."

"Further than this," said the Chief Justice, "we are of opinion that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things, — not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his con-

duct. . We think that a merely remote. and naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios*, protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

All of the cases above cited proceed upon the idea that the prohibition against his being compelled to testify against himself presupposes a legal detriment to the witness arising from the exposure. As the object of the first eight amendments to the Constitution was to incorporate into the fundamental law of the land certain principles of natural justice which had become permanently fixed in the jurisprudence of the mother country, the construction given to those principles by the English courts is cogent evidence of what they were designed to secure and of the limitations that should be put upon them. This is but another application of the familiar rule that where one State adopts the laws of another, it is also presumed to adopt the known and settled construction of those laws by the courts of the State from which they are taken. *Cathcart* v. *Robinson*, 5 Pet. 264, 280; *McDonald* v. *Hovey*, 110 U. S. 619.

The danger of extending the principle announced in *Counselman* v. *Hitchcock* is that the privilege may be put forward for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person, who is interested in concealing the facts to which he would testify. Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding his own good name, to be made the tool of others, who are desirous of seeking shelter behind his privilege.

The act of Congress in question securing to witnesses immunity from prosecution is virtually an act of general amnesty, and belongs to a class of legislation which is not uncommon either in England, (2 Taylor on Evidence, § 1455, where a large number of similar acts are collated,) or in this country. Although the Constitution vests in the President "power to grant reprieves and pardons for offences against the United States, except in cases of impeachment," this power has never been held to take from Congress the power to pass acts of general amnesty, and is ordinarily exercised only in cases of individuals after conviction, although, as was said by this court in *Ex parte Garland*, 4 Wall. 333, 380, "it extends to every offence known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment."

In the case of *The Laura*, 114 U. S. 411, objection was made that a remission by the Secretary of the Treasury, under Rev. Stat. § 4294, of penalties incurred by a steam vessel for taking on board an unlawful number of passengers, was ineffectual to destroy liability by reason of the fact that it involved an exercise of the pardoning power. It was held that, in view of the practice in reference to remissions by the Secretary of the Treasury and other officers, which had been sanctioned by statute and acquiesced in for nearly a century, the power vested in the President was not exclusive in the sense that no other officer could remit forfeitures or penalties incurred for the violation of the laws of the United States — citing *United States* v. *Morris*, 10 Wheat. 246.

The distinction between amnesty and pardon is of no practical importance. It is said in *Knote* v. *United States*, 95 U. S. 149, 152, "the Constitution does not use the word 'amnesty,' and, except that the term is generally applied where pardon is extended to whole classes or communities, instead of individuals, the distinction between them is one rather of philological interest than of legal importance." Amnesty is defined by the lexicographers to be an act of the sovereign power granting oblivion, or a general pardon for a

past offence, and is rarely, if ever, exercised in favor of single individuals, and is usually exerted in behalf of certain classes of persons, who are subject to trial, but have not yet been convicted.

While the decisions of the English courts construing such acts are of little value here, in view of the omnipotence of Parliament, such decisions as have been made under similar acts in this country are, with one or two exceptions, we believe, unanimous in favor of their constitutionality.

Thus in *State* v. *Nowell*, 58 N. H. 314, a statute which provided that a clerk, servant or agent should not be excused from testifying against his principal, and that he should not thereafter be prosecuted for any offence disclosed by him, was held to have deprived him of his privilege of silence. In delivering the opinion, the court observed "that the legislature, having undertaken to obtain the testimony of the witness without depriving him of his constitutional privilege of protection, must relieve him from all liabilities on account of the matters which he is compelled to disclose; otherwise, the statute would be ineffectual. He is to be secured against all liability to future prosecution as effectually as if he were wholly innocent. This would not be accomplished if he were left liable to prosecution criminally for any matter in respect to which he may be required to testify. . . . The conditional exemption becomes absolute when the witness testifies, and, being no longer liable to prosecution, he is not compelled, by testifying, to accuse or furnish evidence against himself. . . . The constitutional privilege of the witness protects, not another person against whom the witness testifies, but the witness himself. The legal protection of the witness against prosecution for crime disclosed by him is, in law, equivalent to his legal innocence of the crime disclosed. . . . The witness, regarded in law as innocent if prosecuted for a crime which he has been compelled by the statute to disclose, will stand as well as other innocent persons, and it was not the design of the common law maxim, affirmed by the bill of rights, that he should stand any better."

In *Kendrick* v. *The Commonwealth*, 78 Virginia, 490, a

statute secured to a witness called to testify concerning unlawful gaming, immunity against prosecution for any offence committed by him at the time and place indicated, and it was held that, as it gave to the witness full indemnity and assurance against any liability to prosecution, it was his duty to testify, notwithstanding that his answer might have a tendency to disgrace him.

The same construction was given to a similar statute of Texas in *Floyd* v. *State*, 7 Texas, 215, though the opinion is brief and does little more than state the conclusions of the court.

In the recent case of *Ex parte Cohen*, 104 California, 524, one Steinberger was charged, under a statute of California, with allowing Cohen to be registered as a voter, knowing that he was not entitled to registration. Cohen, being called as a witness, was asked certain questions with regard to the charge, and set up his privilege. The election law of California provided not only that the testimony given should not be used in any prosecution against the witness, but that he should not thereafter be liable to indictment, information or prosecution for the offence with reference to which his testimony was given. The court held that it was only when his evidence might tend to establish an offence, for which he might be punished under the laws of the State, that a person is a witness "against himself" in a criminal case, and the fact that, in a proceeding in which he is not the defendant, his testimony might tend to show that he had violated the laws of the State, was not sufficient to entitle him to claim this protection of the Constitution, unless he is at the same time liable to prosecution and punishment for such crime.

"If," said the court, "at the time of the transactions, respecting which his testimony is sought, the acts themselves did not constitute an offence; or if, at the time of giving the testimony, the acts are no longer punishable; if the statute creating the offence has been repealed; if the witness has been tried for the offence and acquitted, or, if convicted, has satisfied the sentence of the law; if the offence is barred by the statute of limitations, and there is no pending prosecution

against the witness — he cannot claim any privilege under this provision of the Constitution, since his testimony could not be used against him in any criminal case against himself, and consequently he is not compelled to be a witness 'against himself.' Equally is he deprived of claiming this exemption from giving evidence, if the legislature has declared that he shall not be prosecuted or punished for any offence of which he gives evidence. Any evidence that he may give under such a statutory direction will not be 'against himself,' for the reason that, by the very act of giving the evidence, he becomes exempted from any prosecution or punishment for the offence respecting which his evidence is given. In such a case he is not compelled to give evidence which may be used against himself in any criminal case, for the reason that the legislature has declared that there can be no criminal case against him which the evidence which he gives may tend to establish."

In *Hirsch* v. *State*, 67 Tennessee, 89, the same construction was given to a similar statute in Tennessee, which exempted witnesses from prosecution for offences as to which they had given testimony before the grand jury, the court holding that this was "an abrogation of the offence;" that the witness could neither be accused by another, nor could he accuse himself, and therefore he could not criminate himself by such testimony. It is but just to say, however, that in *Warner* v. *State*, 81 Tennessee, 52, the same statute was construed as merely offering a reward to a witness for waiving his constitutional privilege, and not as compelling him to answer. But, for the reasons already given, we think that the witness cannot properly be said to give evidence against himself, unless such evidence may in some proceeding be used against him, or unless he may be subjected to a prosecution for the transaction concerning which he testifies. In each of the last two cases there were dissenting opinions.

In *Frazee* v. *State*, 58 Indiana, 8, a section of the criminal code of Indiana compelling a witness to testify against another for gaming, and providing that he should not be liable to indictment or punishment in such case, was enforced, though its constitutionality was not considered at length.

Finally, in *People* v. *Sharp*, 107 N. Y. 427, a section of the penal code declared that any person offending against certain provisions of the code relating to bribery might be compelled to testify, but that the person testifying to the giving of a bribe, which has been accepted, shall not thereafter be liable to indictment, prosecution or punishment for that bribery. This statute was held not to be violative of the constitutional provision that no person shall be compelled in any criminal case to be a witness against himself. Counsel in that case seem to have pursued much the same line of argument that was made in the case under consideration, claiming that the statutory protection did not go far enough; that the indemnity that it offered to the witness was partial and not complete; that while it might save him from the penitentiary by excluding his evidence, it did not prevent the infamy and disgrace of its exposure. But that, said the court, quoting from *People* v. *Kelly*, 24 N. Y. 74, 83, "is the misfortune of his condition, and not any want of humanity in the law."

It is entirely true that the statute does not purport, nor is it possible for any statute, to shield the witness from the personal disgrace or opprobrium attaching to the exposure of his crime; but, as we have already observed, the authorities are numerous and very nearly uniform to the effect that, if the proposed testimony is material to the issue on trial, the fact that the testimony may tend to degrade the witness in public estimation does not exempt him from the duty of disclosure. A person who commits a criminal act is bound to contemplate the consequences of exposure to his good name and reputation, and ought not to call upon the courts to protect that which he has himself esteemed to be of such little value. The safety and welfare of an entire community should not be put into the scale against the reputation of a self-confessed criminal, who ought not, either in justice or in good morals, to refuse to disclose that which may be of great public utility, in order that his neighbors may think well of him. The design of the constitutional privilege is not to aid the witness in vindicating his character, but to protect him against being compelled to furnish evidence to convict him of a crimi-

nal charge. If he secure legal immunity from prosecution, the possible impairment of his good name is a penalty which it is reasonable he should be compelled to pay for the common good. If it be once conceded that the fact that his testimony may tend to bring the witness into disrepute, though not to incriminate him, does not entitle him to the privilege of silence, it necessarily follows that if it also tends to incriminate, but at the same time operates as a pardon for the offence, the fact that the disgrace remains no more entitles him to immunity in this case than in the other.

It is argued in this connection that, while the witness is granted immunity from prosecution by the Federal government, he does not obtain such immunity against prosecution in the state courts. We are unable to appreciate the force of this suggestion. It is true that the Constitution does not operate upon a witness testifying in the state courts, since we have held that the first eight amendments are limitations only upon the powers of Congress and the Federal courts, and are not applicable to the several States, except so far as the Fourteenth Amendment may have made them applicable. *Barron* v. *Baltimore*, 7 Pet. 243; *Fox* v. *Ohio*, 5 How. 410; *Withers* v. *Buckley*, 20 How. 84; *Twitchell* v. *Commonwealth*, 7 Wall. 321; *Presser* v. *Illinois*, 116 U. S. 252.

There is no such restriction, however, upon the applicability of Federal statutes. The Sixth Article of the Constitution declares that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding."

The language of this article is so direct and explicit, that but few cases have arisen where this court has been called upon to interpret it, or to determine its applicability to state courts. But, in the case of *Stewart* v. *Kahn*, 11 Wall. 493, 505, the question arose whether a debt contracted by a citizen of New Orleans, prior to the breaking out of the rebellion,

was subject in a state court to the statute of limitations passed by Congress June 11, 1864, declaring that as to actions which should accrue during the existence of the rebellion, against persons who could not be served with process by reason of the war, the time when such persons were beyond the reach of judicial process should not be taken or deemed to be any part of the time limited by law for the commencement of such actions. The court held unanimously that the debt was subject to this act, and in delivering the opinion of the court Mr. Justice Swayne said: "But it has been insisted that the act of 1864 was intended to be administered only in the Federal courts, and that it has no application to cases pending in the courts of the State. The language is general. There is nothing in it which requires or will warrant so narrow a construction. It lays down a rule as to the subject, and has no reference to the tribunals by which it is to be applied. A different interpretation would defeat, to a large extent, the object of its enactment. . . . The judicial anomaly would be presented of one rule of property in the Federal courts and another, and a different one, in the courts of the States, and debts could be recovered in the former which would be barred in the latter." This case was affirmed in *United States* v. *Wiley*, 11 Wall. 508; and in *Mayfield* v. *Richards*, 115 U. S. 137. See also *Mitchell* v. *Clark*, 110 U. S. 633. The same principle has also been applied in a number of cases turning upon the effect to be given to treaties in actions arising in the state courts. *Foster* v. *Neilson*, 2 Pet. 253 ; *The Cherokee Tobacco*, 11 Wall. 616 ; *The Head Money cases*, 112 U. S. 580. Of similar character are the cases in which we have held that the laws of the several States upon the subjects of pilotage, quarantines, inspections and other similar regulations were operative only so long as Congress failed to legislate upon the subject.

The act in question contains no suggestion that it is to be applied only to the Federal courts. It declares broadly that "no person shall be excused from attending and testifying . . . before the Interstate Commerce Commission . . . on the ground . . . that the testimony . . . required

of him may tend to criminate him," etc. "But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify," etc. It is not that he shall not be prosecuted for or on account of any *crime* concerning which he may testify, which might possibly be urged to apply only to crimes under the Federal law and not to crimes, such as the passing of counterfeit money, etc., which are also cognizable under state laws; but the immunity extends to any *transaction, matter or thing* concerning which he may testify, which clearly indicates that the immunity is intended to be general, and to be applicable whenever and in whatever court such prosecution may be had.

But even granting that there were still a bare possibility that by his disclosure he might be subjected to the criminal laws of some other sovereignty, that, as Chief Justice Cockburn said in *Queen* v. *Boyes*, 1 B. & S. 311, in reply to the argument that the witness was not protected by his pardon against an impeachment by the House of Commons, is not a real and probable danger, with reference to the ordinary operations of the law in the ordinary courts, but "a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct." Such dangers it was never the object of the provision to obviate.

The same answer may be made to the suggestion that the witness is imperfectly protected by reason of the fact that he may still be prosecuted and put to the annoyance and expense of pleading his immunity by way of confession and avoidance. This is a detriment which the law does not recognize. There is a possibility that any citizen, however innocent, may be subjected to a civil or criminal prosecution, and put to the expense of defending himself, but unless such prosecution be malicious, he is remediless, except so far as a recovery of costs may partially indemnify him. He may even be convicted of a crime and suffer imprisonment or other punishment before his innocence is discovered, but that gives him no claim to

indemnity against the State, or even against the prosecutor if the action of the latter was taken in good faith and in a reasonable belief that he was justified in so doing.

In the case under consideration, the grand jury was engaged in investigating certain alleged violations of the Interstate Commerce Act, among which was a charge against the Allegheny Valley Railway Company of transporting coal of the Union Coal Company from intermediate points to Buffalo, at less than the established rates between the terminal points, and a further charge of discriminating in favor of such coal company by rebates, drawbacks or commissions on its coal, by which it obtained transportation at less than the tariff rates. Brown, the witness, was the auditor of the road, whose duty it was to audit the accounts of the officers, and the money paid out by them. Having audited the accounts of the freight department during the time in question, he was asked whether he knew of any such discrimination in favor of the Union Coal Company, and declined to answer upon the ground that he would thereby incriminate himself.

As he had no apparent authority to make the forbidden contracts, to receive the money earned upon such contracts, or to allow or pay any rebates, drawbacks or commissions thereon, and was concerned only in auditing accounts, and passing vouchers for money paid by others, it is difficult to see how, under any construction of section 10 of the Interstate Commerce Act, he could be said to have wilfully done anything, or aided or abetted others in doing anything, or in omitting to do anything, in violation of the act—his duty being merely to see that others had done what they purported to have done, and that the vouchers rendered by them were genuine. But, however this may be, it is entirely clear that he was not the chief or even a substantial offender against the law, and that his privilege was claimed for the purpose of shielding the railway or its officers from answering a charge of having violated its provisions. To say that, notwithstanding his immunity from punishment, he would incur personal odium and disgrace from answering these questions, seems too much like an abuse of language to be worthy of serious

consideration. But, even if this were true, under the authorities above cited, he would still be compelled to answer, if the facts sought to be elucidated were material to the issue.

If, as was justly observed in the opinion of the court below, witnesses standing in Brown's position were at liberty to set up an immunity from testifying, the enforcement of the Interstate Commerce law or other analogous acts, wherein it is for the interest of both parties to conceal their misdoings, would become impossible, since it is only from the mouths of those having knowledge of the inhibited contracts that the facts can be ascertained. While the constitutional provision in question is justly regarded as one of the most valuable prerogatives of the citizen, its object is fully accomplished by the statutory immunity, and we are, therefore, of opinion that the witness was compellable to answer, and that the judgment of the court below must be

*Affirmed.*

Mr. Justice SHIRAS, with whom concurred Mr. Justice GRAY and Mr. Justice WHITE, dissenting.

It is too obvious to require argument that, when the people of the United States, in the Fifth Amendment to the Constitution, declared that no person should be compelled in any criminal case to be a witness against himself, it was their intention, not merely that every person should have such immunity, but that his right thereto should not be divested or impaired by any act of Congress.

Did Congress, by the act of February 11, 1893, which enacted that "no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the commission, on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture," seek to *compel* any person to be a witness against himself? And, if so, was such provision of that act void because incompatible with the constitutional guaranty?

That it was the intention of the act to exact compulsory disclosure by every witness of all "testimony or evidence, documentary or otherwise, required of him," regardless of the fact that such disclosure might tend to criminate him or subject him to a penalty or forfeiture, was held by the court below, and such seems to be the plain meaning of the language of the act.

That the questions put to the witness, in the present case, tended to accuse and incriminate him, was sworn to by the witness himself, and was conceded or assumed by the court below. The refusal by the witness, in the exercise of his constitutional immunity, to answer the questions put, was held by the court to be an act of contempt, and the witness was ordered to pay a fine, and to be imprisoned until he should have answered the questions.

The validity of the reasons urged in defence of the action of the court below is the matter which this court has to consider.

Those reasons are found in that other provision of the act, which enacts that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence, documentary or otherwise, before said commission, or in obedience to its subpœna, or either of them, or in any such case or proceeding;" and it is claimed that it was competent for Congress to avoid the plea by a witness of his constitutional immunity, in proceedings under the act in question, by that provision.

As the apparent purpose of the Constitution was to remove the immunity from self-accusation from the reach of legislative power, the first and natural impulse is to regard any act of Congress which authorizes courts to fine and imprison men for refusing to criminate themselves as obviously void. But it is the duty of this court, as the final expositor as well of the Constitution as of the acts of Congress, to dispassionately consider and determine this question.

It is sometimes said that, if the validity of a statute is merely doubtful, if its unconstitutionality is not plainly ob-

vious, the courts should not be ready to defeat the action of the legislative branch of the government; and it must be conceded that when such questions arise, under the ordinary exercise of legislative power, it is plainly the duty of the courts not to dispense with the operation of laws formally enacted, unless the constitutional objections are clear and indisputable.

On the other hand, when the courts are confronted with an explicit and unambiguous provision of the Constitution, and when it is proposed to avoid, or modify, or alter the same by a legislative act, it is their plain duty to enforce the constitutional provision, unless it is clear that such legislative act does not infringe it in letter or spirit.

Before addressing ourselves immediately to the case in hand, it may be well to examine the authorities respectively cited.

The first case in which there was any consideration of this constitutional provision was the proceeding in the Circuit Court of the United States for the District of Virginia, in the year 1807, wherein Aaron Burr was indicted and tried for treason, and for a misdemeanor in preparing the means of a military expedition against Mexico, a territory of the King of Spain, with whom the United States were at peace.

It appears from the report of that case, as made by David Robertson, and published in two volumes by Hopkins & Earle, in Philadelphia, in 1808, that, in the first place, an application was made to Chief Justice Marshall, sitting as a committing magistrate, by the District Attorney of the United States, to commit the accused on two charges: 1st, for setting on foot and providing the means for an expedition against the territories of a nation at peace with the United States; and, 2d, for committing high treason against the United States. Burr was committed to answer the first charge only; but, at the subsequent term of the court, the application to commit him on a charge of high treason was renewed, testimony to sustain the charge was adduced, Burr was bound over to answer the charge, and a grand jury was empanelled and charged by the Chief Justice.

While the grand jury was considering the case, the District Attorney called to be sworn Dr. Erick Bollman, with a view that he should testify before the grand jury; and as it appeared that the facts to which he was expected to testify might involve him as an accessory, the District Attorney produced and tendered the witness a pardon by the President of the United States. This pardon the witness declined to accept, and thereupon argument was had as to the operation of a pardon which the witness declined to accept, and as to whether the witness or the court was to be the judge as to the propriety of answering the questions put. Upon those points the Chief Justice reserved his decision. Nor does it appear that he made any decision — probably because Dr. Bollman went voluntarily before the grand jury and testified. Burr's Trial, vol. 1, pp. 190, 193. Subsequently, while the grand jury was still considering the case, one Willie was called and asked whether he had, under instructions from Aaron Burr, copied a certain paper, which was then exhibited to him. This question the witness refused to answer, lest he might thereby incriminate himself. The Chief Justice observing that, if the witness was to decide upon this, it must be on oath, interrogated the witness whether his answering the question would criminate himself, to which he replied that it might in a certain case. Thereupon the Chief Justice withheld the point for argument. A full and able argument was had, and, after consideration, the Chief Justice expressed himself as follows: "When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it *may* criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment; because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privileges which the law allows, and which he claims. It follows, necessarily, then, from this state of

things, that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say, upon his oath, that his answer would criminate himself, the court can demand no other testimony of the fact. If the declaration be untrue, it is in conscience and in law as much a perjury as if he had declared any other untruth upon his oath; as it is one of those cases in which the rule of law must be abandoned, or the oath of the witness be received. The counsel for the United States have also laid down this rule, according to their understanding of it, but they appear to the court to have made it as much too narrow as the counsel for the witness have made it too broad. According to their statement, a witness can never refuse to answer any question, unless that answer, unconnected with other testimony, would be sufficient to convict him of a crime. This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable, case, that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing; but all other facts without it might be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compelled to accuse himself, would most obviously be infringed by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is attainable, against any individual, the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that might form a necessary and essential part of a crime, which is pun-

ishable by the laws. . . . In such a case, the witness must himself judge what his answer will be; and if he say, on oath, that he cannot answer without accusing himself, he cannot be compelled to answer." 1 Burr's Trial, 244, 245.

In *Boyd* v. *United States*, 116 U. S. 616, there came into question the validity of the fifth section of the act of June 22, 1874, c. 391, 18 Stat. 186, wherein it was provided that "in all suits and proceedings other than criminal arising under any of the revenue laws of the United States, the attorney representing the government, whenever in his belief any business book, invoice or paper belonging to, or under the control of, the defendant or claimant, will tend to prove any allegation made by the United States, may make a written motion, particularly describing such book, invoice or paper, and setting forth the allegation which he expects to prove; and thereupon the court in which suit or proceeding is pending may, at its discretion, issue a notice to the defendant or claimant to produce such book, invoice or paper in court, at a day and hour to be specified in said notice, which, together with a copy of said motion, shall be served formally on the defendant or claimant by the United States marshal by delivering to him a certified copy thereof, or otherwise serving the same as original notices of suits in the same court are served; and if the defendant or claimant shall fail or refuse to produce such book, invoice or paper, in obedience to such notice, the allegations stated in the said motion shall be taken as confessed, unless his failure or refusal shall be explained to the satisfaction of the court."

This section was held to be unconstitutional and void as applied to suits for penalties, or to establish a forfeiture of the party's goods, as being repugnant to the Fourth and Fifth Amendments of the Constitution.

It was contended on behalf of the government that the act of February 25, 1868, c. 13, 15 Stat. 37, whereby it was enacted that "no answer or other pleading of any party, and no discovery, or evidence obtained by means of any judicial proceeding from any party or witness in this or any foreign country, shall be given in evidence or in any manner used against such party or witness, or his property or estate, in any

court of the United States, or in any proceeding by or before any officer of the United States in respect to any crime, or for the enforcement of any penalty or forfeiture by reason of any act or omission of such party or witness," relieved the act of June 22, 1874, of the objections made. But this court said, by Mr. Justice Bradley, (p. 632,) "No doubt it was supposed that in this new form, couched as it was in almost the language of the fifteenth section of the old Judiciary Act, except leaving out the restriction to cases in which the court of chancery would decree a discovery, it would be free from constitutional objection. But we think it has been made to appear that this result has not been attained, and that the law, though speciously worded, is still obnoxious to the prohibition of the Fourth Amendment of the Constitution as well as of the Fifth."

Other observations made by Mr. Justice Bradley in that case are worthy to be quoted:

"As therefore suits for penalties and forfeitures incurred by the commission of offences against the law are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure — and an unreasonable search and seizure — within the meaning of the Fourth Amendment. Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains their substance and essence, and effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of proced-

ure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*. We have no doubt that the legislative body is actuated by the same motives; but the vast accumulation of public business brought before it sometimes prevents it, on a first presentation, from noticing objections which become developed by time and the practical application of the objectionable law." 116 U. S. 634, 635.

In the recent case of *Counselman* v. *Hitchcock*, 142 U. S. 547, there was a proceeding before a grand jury to investigate certain alleged violations of the act to regulate commerce, and one Charles Counselman, having appeared before the grand jury and been sworn, declined to answer certain questions put to him, on the ground that the answers might tend to criminate him. The District Court of the United States for the Northern District of Illinois, after a hearing, adjudged Counselman to be in contempt of court, and made an order fining him, and directing that he be kept in custody by the marshal until he should have answered said questions. Thereupon Counselman filed a petition in the Circuit Court of the United States, setting forth the facts, and praying for a writ of *habeas corpus*. That court held that the District Court was in the exercise of its lawful authority in doing what it had done, dismissed Counselman's petition, and remanded him to the custody of the marshal. 44 Fed. Rep. 268. An appeal was taken to this court, by which the judgment of the Circuit Court was reversed, and the cause was remanded to that court with a direction to discharge the appellant from custody. Mr. Justice Blatchford, in delivering the opinion of the court, made a careful review of the adjudged cases, including several decisions in States where there is a like constitutional provision to that contained in

the Federal Constitution, and where attempts had been made by legislation to avoid the constitutional provision by substituting provisions relieving the witness from future criminal prosecution. It is needless to here examine those cases.

The contention there made on behalf of the government was that a witness is not entitled to plead the privilege of silence, except in a criminal case against himself; but this court said:

" Such is not the language of the Constitution. Its provision is that no person shall be compelled in *any* criminal case to be a witness against himself. This provision must have a broad construction in favor of the right which it was intended to secure. The matter under investigation by the grand jury in this case was a criminal matter, to inquire whether there had been a criminal violation of the Interstate Commerce Act. If Counselman had been guilty of the matters inquired of in the questions which he refused to answer, he himself was liable to criminal prosecution under the act. The case before the grand jury was, therefore, a criminal case. The reason given by Counselman for his refusal to answer the questions was that his answers might tend to criminate him, and showed that his apprehension was that, if he answered the questions truly and fully, (as he was bound to do if he should answer them at all,) the answers might show that he had committed a crime against the Interstate Commerce Act, for which he might be prosecuted. His answers, therefore, would be testimony against himself, and he would be compelled to give them in a criminal case.

" It is impossible that the meaning of the constitutional provision can only be, that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he had himself committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard." 142 U. S. 562.

To the argument that section 860 of the Revised Statutes, which provides that "no pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States in any criminal proceeding, or for the enforcement of any penalty or forfeiture," removed the constitutional privilege of Counselman, the court said: "That section must be construed as declaring that no evidence obtained from a witness by means of a judicial proceeding shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture. . . . This, of course, protected him against the use of his testimony against him or his property in any prosecution against him or his property, in any criminal proceeding in a court of the United States. But it had only that effect. It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted.

"The constitutional provision distinctly declares that a person shall not 'be compelled in any criminal case to be a witness against himself;' and the protection of section 860 is not coextensive with the constitutional provision. Legislation cannot detract from the privilege afforded by the Constitution. It would be quite another thing if the Constitution had provided that no person shall be compelled in any criminal case to be a witness against himself, unless it should be provided by statute that criminating evidence extracted from a witness against his will should not be used against him. But a mere act of Congress cannot amend the Constitution, even if it should engraft thereon such a proviso." 142 U. S. 564, 565.

It is, however, now contended, and that is the novel feature of the present case, that the following provision in the act of February 11, 1893, removes the constitutional difficulty : " But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said commission." And it is surmised that this proviso was enacted in view of a suggestion to that effect in the opinion in the *Counselman case.*

It is, indeed, true that Mr. Justice Blatchford did say that "no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates;" and it may be inferred from this language that there might be framed a legislative substitute for the constitutional privilege which would legally empower a court to compel an unwilling witness to criminate himself. But the case did not call for such expression of opinion, nor did Mr. Justice Blatchford undertake to suggest the form of such an enactment. Indeed, such a suggestion would not have comported with his previous remarks, above cited, that "legislation cannot detract from the privilege afforded by the Constitution. It would be quite another thing if the Constitution had provided that no person shall be compelled, in any criminal case, to be a witness against himself, unless it should be provided by statute that criminating evidence extracted from a witness against his will should not be used against him. But a mere act of Congress cannot amend the Constitution, even if it should engraft thereon such a proviso."

Is, then, the undeniable repugnancy that exists between the constitutional guaranty and the compulsory provisions of the

act of February 11, 1893, overcome by the proviso relieving the witness from prosecution and from any penalty or forfeiture "for or on account of any transaction, matter or thing, concerning which he may testify or produce evidence?"

As already said, the very fact that the founders of our institutions, by making the immunity an express provision of the Constitution, disclosed an intention to protect it from legislative attack, creates a presumption against *any* act professing to dispense with the constitutional privilege. It may not be said that, by no form of enactment, can Congress supply an adequate substitute, but doubtfulness of its entire sufficiency, uncertainty of its meaning and effect, will be fatal defects.

What, then, is meant by the clause in this act that "*no person shall be prosecuted . . . for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise?*" How possibly can effect be given to this provision, if taken literally? If a given person is charged with a wilful violation of the Interstate Commerce Act, how can the prosecuting officers or the grand juries know whether he has been examined as a witness concerning the same matter before the commission or some court? Nor can the accused himself necessarily know what particular charge has been brought against him, until an indictment has been found. But when an indictment has been found, and the accused has been called upon to plead to it, he assuredly has been *prosecuted*. So that all that can be said is, that the witness is *not* protected, by the provision in question, from being *prosecuted*, but that he has been furnished with a good plea to the indictment, which will secure his acquittal. But is that true? Not unless the plea is sustained by competent evidence. His condition, then, is that he has been prosecuted, been compelled, presumably, to furnish bail, and put to the trouble and expense of employing counsel and furnishing the evidence to make good his plea. It is no reply to this to say that his condition, in those respects, is no worse than that of any other innocent man, who may be wrongfully charged. The latter has not been compelled, on penalty of

fine and imprisonment, to disclose under oath facts which have furnished a clue to the offence with which he is charged.

Nor is it a matter of perfect assurance that a person who has compulsorily testified, before the commission, grand jury, or court, will be able, if subsequently indicted for some matter or thing concerning which he testified, to procure the evidence that will be necessary to maintain his plea. No provision is made in the law itself for the preservation of the evidence. Witnesses may die or become insane, and papers and records may be destroyed by accident or design.

Again, what is the meaning of the clause of the act that "no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying?" The implication would seem to be that, except for such a clause, perjury could not be imputed to a witness who had been compelled to so testify. However that may be, and whether or not the clause is surplusage, it compels attention to the unfortunate situation in which the witness is placed by the provisions of this act. If he declines to testify on the ground that his answer may incriminate himself, he is fined and imprisoned. If he submits to answer, he is liable to be indicted for perjury by either or both of the parties to the controversy. His position in this respect is not that of ordinary witnesses testifying under the compulsion of a subpœna. His case is that of a person who is exempted by the Constitution from testifying at all in the matter. He is told, by the act of Congress, that he must nevertheless testify, but that he shall be protected from any prosecution, penalty or forfeiture by reason of so testifying. But he is subjected to the hazard of a charge of perjury, whether such charge be rightfully or wrongfully made. It does not do to say that other witnesses may be so charged, because if the privilege of silence, under the constitutional immunity, had not been taken away, this witness would not have testified, and could not have been subjected to a charge of perjury.

Another danger to which the witness is subjected by the withdrawal of the constitutional safeguard is that of a prosecution in the state courts. The same act or transaction

which may be a violation of the Interstate Commerce Act may also be an offence against a state law. Thus, in the present case, the inquiry was as to supposed rebates on freight charges. Such payments would have been in disregard of the Federal statute, but a full disclosure of all the attendant facts (and if he testify at all he must answer fully) might disclose that the witness had been guilty of embezzling the moneys entrusted to him for that purpose; or it might have been disclosed that he had made false entries in the books of the state corporation, in whose employ he was acting. These acts would be crimes against the State, for which he might be indicted and punished, and he may have furnished, by his testimony in the Federal court or before the commission, the very facts or, at least, clues thereto which led to his prosecution.

It is, indeed, claimed that the provisions under consideration would extend to the state courts and might be relied on therein as an answer to such an indictment. We are unable to accede to such a suggestion. As Congress cannot create state courts, nor establish the ordinary rules of property and of contracts, nor denounce penalties for crimes and offences against the States, so it cannot prescribe rules of proceeding for the state courts. The cases of *Stewart* v. *Kahn*, 11 Wall. 493; *United States* v. *Wiley*, 11 Wall. 508, and *Mayfield* v. *Richards*, 115 U. S. 137, are referred to as sustaining the proposition. Those were cases defining the scope and effect of the act of Congress of June 11, 1864, providing that as to actions which should accrue, during the existence of the rebellion, against persons who could not be served with process by reason of the war, the time when such persons were beyond the reach of process should not be taken or deemed to be any part of the time limited by law for the commencement of such actions. And it was held that it was the evident intention of Congress that the act was to apply to cases in state as well as in Federal courts, and as to the objection that Congress had no power to lay down rules of action for the state courts, it was held that the act in question was within the war power as an act to remedy an evil which was one of the

consequences of the war, Mr. Justice Swayne saying: The war "power is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress. This act falls within the latter category. The power to pass it is necessarily implied from the powers to make war and suppress insurrections. It is a beneficent exercise of this authority. It only applies coercively the principle of the law of nations, which ought to work the same results in the courts of all the rebellious States without the intervention of this enactment." 11 Wall. 507.

Whatever may be thought of these cases, and of the reasoning on which they proceed, it is plain that they are not applicable to the present statute. The latter does not in express terms, nor by necessary implication, extend to the state courts; and, if it did, it could not be sustained as an exercise of the war power. On this part of the subject it will be sufficient to cite the language of Chief Justice Marshall in giving the opinion of the court in the case of *Barron* v. *Baltimore*, 7 Pet. 243, 247:

"The judgment brought up by this writ of error having been rendered by the court of a State, this tribunal can exercise no jurisdiction over it, unless it be shown to come within the provisions of the twenty-fifth section of the Judiciary Act.

"The plaintiff in error contends that it comes within that clause in the Fifth Amendment to the Constitution, which inhibits the taking of private property for public use without just compensation. He insists that this Amendment, being in favor of the liberty of the citizen, ought to be so construed as to restrain the legislative power of a State, as well as that of the United States. If this proposition be untrue, the court can take no jurisdiction of the cause. The question thus presented is, we think, of great importance, but not of much difficulty.

"The Constitution was ordained and established by the people of the United States for themselves, for their own government, and not for the government of the individual States.

Each State established a constitution for itself, and, in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The powers they conferred on this government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally and, we think, necessarily applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments framed by different persons and for different purposes.

"If these propositions be correct, the Fifth Amendment must be understood as restraining the power of the general government, not as applicable to the States. In their several constitutions they have imposed such restriction on their respective governments as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively, and with which others interfere no further than they are supposed to have a common interest. . . . We are of opinion that the provision in the Fifth Amendment to the Constitution, declaring that private property shall not be taken for public use without just compensation, is intended solely as a limitation on the exercise of power by the government of the United States, and is not applicable to the legislation of the States."

This result has never since been questioned. As, then, the provision of the Constitution of the United States which protects witnesses from self-incrimination cannot be invoked in a state court, so neither can the congressional substitute therefor.

It is urged that, even if the state courts would not be compelled to respect the saving clause of the Federal statute, in respect to crimes against the State, yet that such a jeopardy is too remote to be considered. The force of this contention is not perceived. On the contrary, such is the nature of the commerce which is controlled by the Interstate Commerce law,

so intimately involved are the movements of trade and transportation, as well within as between the States, that just such questions as those which are now considered may be naturally expected to frequently arise.

It is said that the constitutional protection is solely against prosecutions of the government that grants it, and that, in this case, the questions asked the witness related exclusively to matters of interstate commerce, in respect of which there can be but one sovereign; that his refusal to answer related to his fear of punishment by *that* sovereign, and to nothing else; and that no answer the witness could make could possibly tend to criminate him under the laws of any other government, be it foreign or state.

But, as we have seen, it is entirely within the range of probable events that the very same act or transaction may constitute a crime or offence against both governments, state and Federal. This was manifested in the case of *Ex parte Fonda,* 117 U. S. 516. This was an original application to this court for a writ of *habeas corpus* by one who was a clerk in a national bank, and who alleged in his petition that he had been convicted in one of the courts of Michigan under a statute of that State, and sentenced to imprisonment for having embezzled the funds of that banking institution. The principal ground upon which he asked for a writ of *habeas corpus* and for his discharge from custody was that the offence for which he was tried was covered by the statutes of the United States, and was therefore exclusively cognizable by the Federal courts. But this court refused the application, without, however, deciding whether the same act was or was not an offence against both governments. A similar question was presented in *New York* v. *Eno,* 155 U. S. 89, 98, and these observations were made by Mr. Justice Harlan, who delivered the opinion of the court: "Whether the offences described in the indictment against Eno are offences against the State of New York and punishable under its laws, or are made by existing statutes offences also against the United States and are exclusively cognizable by courts of the United States; and whether the same acts on the part of the accused may

be offences against both the national and state governments and punishable in the judicial tribunals of each government, without infringing upon the constitutional guaranty against being put twice in jeopardy for the same offence; these are questions which the state court of original jurisdiction is competent to decide in the first instance;" and accordingly the writ of *habeas corpus* was dismissed, and the accused was remanded to the custody of the state authorities. But, as already observed, not only may the same act be a common offence to both governments, but the disclosures compulsively made in one proceeding may give clues and hints which may be subsequently used against the witness in another, to the loss of his liberty and property.

Much stress was laid in the argument on the supposed importance of this provision in enabling the commission and the courts to enforce the salutary provisions of the Interstate Commerce Act. This, at the best, is a dangerous argument, and should not be listened to by a court, to the detriment of the constitutional rights of the citizen. If, indeed, experience has shown, or shall show, that one or more of the provisions of the Constitution has become unsuited to affairs as they now exist, and unduly fetters the courts in the enforcement of useful laws, the remedy must be found in the right of the nation to amend the fundamental law, and not in appeals to the courts to substitute for a constitutional guaranty the doubtful and uncertain provisions of an experimental statute.

It is certainly speaking within bounds to say that the effect of the provision in question, as a protection to the witness, is purely conjectural. No court can forsee all the results and consequences that may follow from enforcing this law in any given case. It is quite *certain* that the witness is *compelled* to testify against himself. Can any court be *certain* that a sure and sufficient substitute for the constitutional immunity has been supplied by this act; and if there be room for reasonable doubt, is not the conclusion an obvious and necessary one?

It is worthy of observation that opposite views of the validity of this provision have been expressed in the only two cases

in which the question has arisen in the Circuit Court—one, in the case of the *United States* v. *James*, 60 Fed. Rep. 257, where the act was held void; the other, the present case. In most of the cases cited, wherein state courts have passed upon analogous questions, and have upheld the sufficiency of a statute dispensing with the constitutional immunity, there have been dissenting judges.

A final observation, which ought not to be necessary, but which seems to be called for by the tenor of some of the arguments that have been pressed on the court, is that the constitutional privilege was intended as a shield for the innocent as well as for the guilty. A moment's thought will show that a perfectly innocent person may expose himself to accusation, and even condemnation, by being compelled to disclose facts and circumstances known only to himself, but which, when once disclosed, he may be entirely unable to explain as consistent with innocence.

But surely no apology for the Constitution, as it exists, is called for. The task of the courts is performed if the Constitution is sustained in its entirety, in its letter and spirit.

The judgment of the Circuit Court should be reversed and the cause remanded with directions to discharge the accused from custody.

Mr. Justice Field dissenting.

I am unable to concur with my associates in the affirmance of the judgment of the Circuit Court of the United States for the Western District of Pennsylvania.

The appellant and petitioner had been subpoenaed as a witness before the grand jury, called at a term of the District Court of the same district, to testify with reference to a charge, under investigation by that body, against certain officers and agents of the Allegheny Valley Railroad Company, of having violated certain provisions of the Interstate Commerce Act. Several interrogatories were addressed by the grand jury to the witness, which he refused to answer on the ground that his answers might tend to criminate him. On a

rule to show cause. why he should not be punished for a contempt, and be compelled to answer, he invoked his constitutional privilege of silence.

It is stated in the brief of counsel that no question was raised as to the good faith of the appellant, the petitioner, in invoking this privilege, but the ground was taken and held to be sufficient, that under the statute of Congress of February 11, 1893, he was bound to answer the questions. On his still persisting in his refusal, he was adjudged guilty of contempt and committed. He then sued out a writ of *habeas corpus* from the Circuit Court, and on the production of his body before that court and the return of the marshal, the same position was taken and the statute was held valid and sufficient to require him to answer, and he was accordingly remanded. From the order remanding him and thus adjudging the statute to be valid and constitutional in requiring the witness to answer the inquiries propounded to him, notwithstanding his invoking the privilege of exemption from answering when, upon his statement, his answer would tend to criminate himself, the petitioner appealed to this court.

The Fifth Amendment of the Constitution of the United States declares that no person shall be compelled, in any criminal case, to be a witness against himself. The act of Congress of February 11; 1893, entitled "An act in relation to testimony before the Interstate Commerce Commission, and in cases or proceedings under or connected with an act entitled 'An act to regulate commerce,' approved February 4, 1887, and amendments thereto," provides as follows: "That no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, whether such subpœna be signed or issued by one or more commissioners, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of the act of Congress, entitled 'An act to regulate commerce,' approved February 4, 1887, or of any amendment thereof on the ground or for the reason that the testimony or evidence, documentary

or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding: *Provided*, That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying. Any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, tariffs, contracts, agreements and documents required if in his power to do so, in obedience to the subpœna or lawful requirement of the Commission, shall be guilty of an offence, and upon conviction thereof by a court of competent jurisdiction shall be punished by fine not less than one hundred dollars nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment."

The Fifth Amendment of the Constitution of the United States gives absolute protection to a person called as a witness in a criminal case against the compulsory enforcement of any criminating testimony against himself. He is not only protected from any criminating testimony against himself relating to the offence under investigation, but also relating to any act which may lead to a criminal prosecution therefor.

No substitute for the protection contemplated by the amendment would be sufficient were its operation less extensive and efficient.

The constitutional amendment contemplates that the witness shall be shielded from prosecution by reason of any expressions forced from him whilst he was a witness in a criminal case. It was intended that against such attempted enforcement he might invoke, if desired, and obtain, the shield of absolute silence. No different protection from that afforded by the amendment can be substituted in place of it. The force and extent of the constitutional guarantee are in no respect to be weakened or modified, and the like consider-

ation may be urged with reference to all the clauses and provisions of the Constitution designed for the peace and security of the citizen in the enjoyment of rights or privileges which the Constitution intended to grant and protect. No phrases or words of any provision, securing such rights or privileges to the citizen, in the Constitution are to be qualified, limited or frittered away. All are to be construed liberally that they may have the widest and most ample effect.

No compromise of phrases can be made by which one of less sweeping character and less protective force in its influences can be substituted for any of them. The citizen cannot be denied the protection of absolute silence which he may invoke, not only with reference to the offence charged, but with respect to any act of criminality which may be suggested.

The constitutional guarantee is not fully secured by simply exempting the witness from prosecution for the designated offence involved in his answer as a witness. It extends to exemption from not only prosecution for the offence under consideration but from prosecution for any offence to which the testimony produced may lead.

The witness is entitled to the shield of absolute silence respecting either. It thus exempts him from prosecution beyond the protection conferred by the act of Congress. It exempts him where the statute might subject him to self-incrimination.

The amendment also protects him from all compulsory testimony which would expose him to infamy and disgrace, though the facts disclosed might not lead to a criminal prosecution. It is contended, indeed, that it was not the object of the constitutional safeguard to protect the witness against infamy and disgrace. It is urged that its sole purpose was to protect him against incriminating testimony with reference to the offence under prosecution. But I do not agree that such limited protection was all that was secured. As stated by counsel of the appellant, "it is entirely possible, and certainly not impossible, that the framers of the Constitution reasoned that in bestowing upon witnesses in criminal cases

the privilege of silence when in danger of self-incrimination, they would at the same time save him *in all such cases* from the shame and infamy of confessing disgraceful crimes and thus preserve to him some measure of self-respect. . . ." It is true, as counsel observes, that " both the safeguard of the Constitution and the common law rule spring alike from that sentiment of *personal self-respect, liberty, independence and dignity* which has inhabited the breasts of English speaking peoples for centuries, and to save which they have always been ready to sacrifice many governmental facilities and conveniences. In scarcely anything has that sentiment been more manifest than in the abhorrence felt at the legal compulsion upon witnesses to make concessions which must cover the witness with lasting shame and leave him degraded both in his own eyes and those of others. What can be more abhorrent . . . than to compel a man who has fought his way from obscurity to dignity and honor to reveal crimes of which he had repented and of which the world was ignorant?"

This court has declared, as stated, that " no attempted *substitute* for the constitutional safeguard is sufficient unless it is a *complete* substitute. Such is not the nature and effect of this statute of Congress under consideration. A witness, as observed by counsel, called upon to testify to something which will incriminate him, claims the benefit of the safeguard; he is told that the statute fully protects him against prosecution for his crime; ' but,' he says, ' it leaves me covered with infamy and unable to associate with my fellows;' he is then told that *under the rule of the common law* he would not have been protected against mere infamy, and that the constitutional provision does not assume to protect against infamy *alone*, and that it should not be supposed that its object was to protect against infamy even when associated with crime. But he answers: ' I am not claiming any common law privilege, but this particular constitutional safeguard. What its purpose was does not matter. It saves me from infamy, and you furnish me with no *equivalent*, unless by such equivalent I am equally saved from infamy.'" And it is very justly

urged that "a statute is not a full equivalent under which a witness may be compelled to cover himself with the infamy of a crime, even though he may be armed with a protection against its merely penal consequences."

In *Respublica* v. *Gibbs*, 3 Yeates, 429, in the Supreme Court of Pennsylvania, an indictment was found against the defendant for violation of the law passed in 1799 to regulate the general elections within the Commonwealth. One Benjamin Gibbs, the father of the defendant, a blind and aged man, entitled as an elector, being both a native and an elector above thirty years, who had paid taxes for many years, was led to the election ground by his son and offered his vote. He was told that previous to his vote being received he must answer upon oath or affirmation the following questions, to wit: "Did you at all times during the late revolution continue in allegiance to this State or some one of the United States, or did you join the British forces, or take the oath of allegiance to the King of Great Britain, and if so, at what period? Have you ever been attainted of high treason against this Commonwealth, and if you have, has the attainder been reversed, or have you received a pardon?"

In the litigation which followed these proceedings counsel stated that the constitution of Pennsylvania, formed on the 28th of September, 1776, directs that "no man can be compelled to give evidence against himself," and that the same words were repeated in the constitution of 1790. And it was contended that the true meaning of the constitution and law was that no question should be asked a person, the answer to which may tend to charge him either with a crime or bring him into disgrace or infamy.

The Chief Justice, Shippen, in his charge of the court, among other things, said: "It has been objected that the questions propounded to the electors contravene an established principle of law. The maxim is *nemo tenetur seipsum accusare (seu prodere)*. It (the maxim) is founded on the best policy, and runs throughout our whole system of jurisprudence. It is the uniform practice of courts of justice as to witnesses and jurors. It is considered cruel and unjust to

propose questions which may tend to criminate the party. And so jealous have the legislature of this Commonwealth been of this mode of discovery of facts that they have refused their assent to a bill brought in to compel persons to disclose on oath papers as well as facts relating to questions of mere property. And may we not justly suppose, that they would not be less jealous of securing our citizens against this mode of self-accusation? The words *accusare* or *prodere* are general terms, and their sense is not confined to cases where the answers to the questions proposed would induce to the punishment of the party; if they would involve him in shame or reproach, he is under no obligation to answer them. The avowed object of putting them is to show that the party is under a legal disability to elect or be elected; and they might create an incapacity to take either by purchase or descent, to be a witness or juror, etc. We are all clear on this point, that the inspectors were not justified in proposing the question objected to, though it is probable they did not wrong intentionally. Nevertheless, if by exacting an illegal oath the election was obstructed or interrupted, it seems most reasonable to attribute it to them."

And in *Galbreath and others* v. *Eichelberger*, reported in that volume, 3 Yeates, 515, it was held by the same court that "no one will be compelled to be sworn as a witness whose testimony tends to accuse himself of an immoral act."

It is conceded as an established doctrine, universally assented to, that a witness claiming his constitutional privilege cannot be questioned concerning the way in which he fears he may incriminate himself, or, at least, only so far as may be needed to satisfy the court that he is making his claim in good faith, and not as a pretext. *Fisher* v. *Ronalds*, 12 C. B. 762; *Adams* v. *Lloyd*, 3 H. & N. 351; *Regina* v. *Boyes*, 7 Jur. N. S. Part 1, 1158; 22 Am. Law Rev. 21, note, p. 28; 2 Crim. Law Mag. 645, note, 654.

To establish such good faith on the part of the witness in claiming his constitutional privilege of exemption—from self-incrimination, where he is examined as a witness in a criminal

case, he may be questioned as to his apprehension of crimi-
nating himself by his answer, but no further.

The position that if witnesses are allowed to assert an ex-
emption from answering questions when in their opinion such
answers may tend to incriminate them, the proof of offence
like those prescribed by the Interstate Commerce act will
be difficult and probably impossible — ought not to have a
feather's weight against the abuses which would follow neces-
sarily the enforcement of criminating testimony. The abuses
and perversions of sound principles which would creep into
the law by yielding to arguments like these — to what is
supposed to be necessary for the public good — cannot be
better stated than it was by the late Justice Bradley in *Boyd*
v. *United States*, 116 U. S. 616, 635. Said the learned justice :

" Illegitimate and unconstitutional practices get their first
footing in that way, namely, by silent approaches and slight
deviations from legal modes of procedure. This can only be
obviated by adhering to the rule that constitutional provi-
sions for the security of person and property should be liber-
ally construed. *A close and literal construction deprives them
of half their efficacy*, and leads to gradual depreciation of the
right, as if it consisted more in sound than substance. It
is the duty of courts to be watchful for the constitutional
rights of the citizens and against any stealthy encroachments
thereon. Their motto should be *obsta principiis*."

And the same great and learned justice adds:

" The freedom of thought, of speech and of the press;
the right to bear arms; exemption from military dictation ;
security of the person and of the home; the right to speedy
and public trial by jury; protection against oppressive bail
and cruel punishment, are, together with exemption from
self-crimination, the essential and inseparable features of Eng-
lish liberty. Each one of these features had been involved in
the struggle above referred to in England within the century
and a half immediately preceding the adoption of the Consti-
tution, and the contests were fresh in the memories and tradi-
tions of the people at that time." *Boyd* v. *The United States*,
116 U. S. 626.

The act of Congress of February 11, 1893, very materially qualifies the constitutional privilege of exemption of a witness in a criminal case from testifying, and removes the security against unreasonable searches and seizures which is also provided by the Constitution against the exposure of one's private books and papers.

The Fourth Amendment of the Constitution, which declares that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated," is equally encroached upon by the law in question.

The position of the respondent, that the witness can lawfully be compelled to answer on the ground that the act of Congress in effect abrogates the constitutional privilege, in providing that the punishment of the alleged offence, in relation to which the witness was sought to be examined, shall not be imposed in case he answers the interrogatories propounded, is not sound on two grounds: First, because the statute could not abrogate or in any respect diminish the protection conferred by the constitutional amendment; and, secondly, because the statute does not purport to abrogate the offence, but only provides protection against any proceeding to punish it. The constitutional safeguards for security and liberty cannot be thus dealt with. They must stand as the Constitution has devised them. They cannot be set aside and replaced by something else on the ground that the substitute will probably answer the same purpose. The citizen, as observed by counsel, is entitled to the very thing which the language of the Constitution assures to him.

Every one is protected by the common law from compulsory incrimination of himself. This protection is a part of that general security which the common law affords against defamation, that is, against malicious and false imputations upon one's character, as it defends against injurious assaults upon one's person, even though the defamation is created by publication made by himself under compulsion. The defamation arising from self-incrimination may be equally injurious as if originating purely from the maliciousness of others.

The reprobation of compulsory self-incrimination is an established doctrine of our civilized society. As stated by appellant's counsel, it is the " result of the long struggle between the opposing forces of the spirit of individual liberty on the one hand and the collective power of the State on the other." As such, it should be condemned with great earnestness.

The essential and inherent cruelty of compelling a man to expose his own guilt is obvious to every one, and needs no illustration. It is plain to every person who gives the subject a moment's thought.

A sense of personal degradation in being compelled to incriminate one's self must create a feeling of abhorrence in the community at its attempted enforcement.

The counsel of the appellant justly observes on this subject, as on many of the proceedings taken to escape from the enforcement of the constitutional and legal protection, established to guard a citizen from any unnecessary restraints upon his person, action or speech, that " the proud sense of personal independence which is the basis of the most valued qualities of a free citizen is sustained and cultivated by the consciousness that there are limits which even the State cannot pass in tearing open the secrets of his bosom. The limit which the law carefully assigns to the power to make searches and seizures proceeds from the same source."

The doctrine condemning attempts at self-incrimination is declared in numerous cases. Starkie, in his treatise on Evidence, observes that the rule forbidding such incrimination is based upon two grounds, one of policy and one of humanity, " of policy because it would force a witness under a strong temptation to commit perjury, and of humanity because it would be to extort a confession by duress, every species and description of which the law abhors." (Am. ed. pp. 40, 41.)

In *United States* v. *Collins*, 1 Woods, 511, Mr. Justice Bradley said " the immunity was founded upon principles of public policy and a just regard to the liberties of every citizen." And we have no sympathy for the efforts of any individual or tribunal to weaken or fritter away any of the provisions of the Constitution, even the least, intended for

the protection of the private rights of the citizen. Those provisions should receive the construction which would give them the widest and most beneficent effect intended.

But there is another and conclusive reason against the statute of Congress. It undertakes, in effect, to grant a pardon in certain cases to offenders against the law, that is, on condition that they will give full answers to certain interrogatories propounded. It declares that the alleged offender shall not be punished for his offence upon his compliance with a certain condition. The legal exemption of an individual from the punishment which the law prescribes for the crime he has committed is a pardon, by whatever name the act may be termed. And a pardon is an act of grace which is, so far as relates to offenders against the United States, the sole prerogative. of the President to grant.

In *Ex parte Garland*, 4 Wall. 333, 380, this court, after stating that the Constitution provides that the President shall have power to grant reprieves and pardons for offences against the United States except in cases of impeachment, says: " The power thus conferred is unlimited with the exception stated. It extends to every offence known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment. This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be affected by any legislative restrictions."

Congress cannot grant a pardon. That is an act of grace which can only be performed by the President. The constitutional privilege invoked by the appellant should have had full effect, and its influence should not have been weakened in any respect by the statute which attempted to exercise a prerogative solely possessed by the President.

The order remanding the appellant should, therefor, in my judgment, be reversed, and an order entered that he be discharged from custody and be set at liberty.