**UNITED STATES v. MOLASKY, and four other cases.**

**No. 7462-6.**

Circuit Court of Appeals, Seventh Circuit.
Feb. 26, 1941.

Rehearing Denied March 18, 1941.

Writ of Certiorari Granted June 2, 1941.

See 61 S.Ct. 1110, 85 L.Ed. ——.

130

KERNER, Circuit Judge, dissenting in part.

David Baron, of St. Louis, Mo., and John L. McInerney, Warren Canaday, and

Jos. A. Struett, all of Chicago, Ill., for appellants.

J. Albert Woll, U. S. Atty., and Austin Hall, Asst. U. S. Atty., both of Chicago, Ill., for appellee.

Before MAJOR and KERNER, Circuit Judges, and BRIGGLE, District Judge.

MAJOR, Circuit Judge.

These are appeals of William Molasky, James M. Ragen, James M. Ragen, Jr., Lester A. Kruse and Arnold W. Kruse, from judgments of conviction entered September 12, 1940. The indictment, upon which they were jointly tried, was returned August 22, 1939, by the regular June term grand jury, which had been authorized to continue for the purpose of completing investigations commenced during the June term. The indictment contained five counts, the first four of which charged these appellants, together with Moses L. Annenberg, Jules Taylor and Herbert S. Kamin, and the Consensus Publishing Company, an Illinois corporation (hereinafter referred to as "Consensus") with wilfully attempting to evade and defeat the Federal tax on the income of Consensus during the years 1933 to 1936, both inclusive, in violation of Section 145(b), Title 26, U.S.C.A. Int.Rev. Code. The fifth count charged the defendants with conspiring to evade and defeat the Federal tax on the income of Consensus for the years 1929 to 1936, both inclusive, in violation of Section 88, Title 18, U.S.C.A.

Prior to trial, the defendants Annenberg, Taylor and Kamin were dismissed as defendants. The case was tried to a jury which returned a verdict finding all of the instant defendants (appellants) guilty on all counts, except Lester A. Kruse, and finding him guilty on the fourth and fifth counts, upon which verdict the Trial Court entered the judgments now under attack. Previous to the trial, certain preliminary motions and pleas were filed, some applicable to all, and others to only certain of the defendants.

The appeals may be said, in a general way, to involve the alleged errors of the Trial Court in its denial of motions to dismiss the indictment; in its refusal to permit inspection of the Grand Jury minutes and to discharge the oath of secrecy sur-

rounding the proceedings of the Grand Jury, in striking certain of the defendants' pleas in abatement based upon the presence of unauthorized persons before the Grand Jury, in dismissing special immunity pleas in bar; in the admission of evidence; in its denial of motions for directed verdict, for a new trial and in arrest of judgment, and in the court's charge to the jury.

Insofar as a discussion of the indictment is concerned, it would be sufficient to set forth the charge in abbreviated form. In view of the theories advanced by the respective parties, however, as to the merits of the controversy, it appears material to make a substantial statement regarding the charge as alleged. The first count is typical of the first four and charges that the defendants filed a return in 1934 for the taxable year of 1933, and did unlawfully, wilfully and knowingly attempt to evade and defeat a large part, to-wit, $9678.02 of a tax due to the United States on the income of Consensus, and that the attempt was in the manner following: That Consensus was engaged in the business of printing and selling "Run Down Sheets" to a class of persons known as "Bookmakers"; that it maintained offices in St. Louis, Missouri and Cincinnati, Ohio; that William Molasky was the president of the corporation, and that the corporation was required to file an income tax return for the year in question, inasmuch as it had received a gross income of $119,960.96. It alleges that the corporation was entitled to deductions as follows:

| | |
|---|---:|
| Rent on Business Property | $ 562.50 |
| Interest | 89.55 |
| Taxes | 300.00 |
| Depreciation | 1,821.00 |
| Salaries and Wages | 12,757.56 |
| Expenses | 23,258.55 |
| Total Deductions | $38,789.16 |

and that it derived a net income of $81,171.80, upon which it owed a tax of $13,340.22. It also alleges that the defendants, knowing the corporation's income to be as above set forth, wilfully attempted to evade and defeat a part of the tax, to-wit, $9,678.02, and as a means of so wilfully attempting to evade and defeat said tax, they filed a sworn return showing the corporation's gross income to be $119,960.96, and claiming deductions as follows:

| | |
|---|---:|
| Rent on Business Property | $ 562.50 |
| Interest | 89.55 |
| Taxes | 300.00 |
| Depreciation | 1,821.00 |
| Salaries and Wages | 12,757.56 |
| Commissions | 54,537.65 |
| Other Expenses | 23,258.55 |
| Total Deductions | $93,326.81 |

The indictment further alleges that according to the return as filed, a net income of $26,634.15 was shown, with a total tax due and payable of $3662.20, which was paid.

The second, third and fourth counts are in substantially the same form as count one. In fact, they are exactly the same except for such differences as may be occasioned by dates and amounts. It is said that these counts do not state a cause of action and do not sufficiently apprise the defendants of the charge which they are called upon to meet. We think it is true, as contended, that it requires a mathematical computation to determine what item of deduction is charged to be improper. Such calculation readily discloses, however, (count one) that the item of deduction, "Commissions, $54,537.65" is the one by which the defendants are charged with attempting to evade the tax. This result follows by subtracting the total deduction of $38,789.16, admitted to be proper, from the total deduction of $93,326.81, the amount alleged to have been claimed in the return as filed. Thus, it is apparent that the defendants are charged with claiming an unlawful deduction, designated as commissions, of $54,537.65. While it is not apparent why the draftsman of the indictment should leave the most essential element of the charge to a process of calculation, rather than make a direct allegation as to the unlawful deduction, yet we are of the view that the defendants were sufficiently apprised of the offense charged. After all, the gist of the offense is the attempt to evade and defeat the tax, and if the defendants were in doubt as to the means alleged, they could have requested a bill of particulars. This was not done, and "we can not presume that the request would have been refused." Capone v. United States, 7 Cir., 56 F.2d 927, 931.

We do not understand that defendants question the validity of the fifth count of the indictment, but inasmuch as the substance of the charge is material, as will be subsequently developed, it appears not inappropriate to refer to it at this point. It charges the defendants with conspiring to evade and defeat the taxes on the income of Consensus for the years 1929 to 1936, both inclusive. The gross income, deductions, net income and tax due for each of the years included in the conspiracy is set forth. For instance, for the year 1933 (the return for this year was made in 1934 as shown in count one of the indictment) the gross income was alleged as $119,960.68, deductions $38,789.16, net income $81,171.80, and tax due $13,340.22. There is then set forth for each year an item of improper deduction claimed in the return by reason of alleged false employment contracts. For the year 1933, this item is in the amount of $54,537.65. The difference between the total net income as reported for the years included in the indictment period, and the correct total net income for those years, as alleged, is the amount upon which it is alleged a tax was payable. In other words, this difference represents the amounts which were claimed as deductions in the tax returns under the heading of commissions. This discrepancy, so it is alleged, resulted in a tax evasion in the sum of $77,883.53. The count further alleges, among other things, that the defendants were not employed in an executive capacity, nor in any other capacity whatsoever, by the said corporation during the calendar years 1929 to 1936, inclusive, nor did they or any one of them, or anyone for them, render any service to the said corporation, but that the defendants were owners and holders of beneficial interest for themselves and others in the said corporation, and that all of the moneys paid to them and each of them, were, in truth and in fact, distribution of profits and dividends from earnings of the said corporation. Numerous overt acts are alleged which do not appear material to relate.

On October 30, 1939, there was filed by Kruse and Kruse, and on the same date by Molasky, what are designated as petitions for an order releasing the oaths of grand jury secrecy. Numerous allegations were made in an attempt to show that this secrecy should be removed and the defendants permitted to inspect the minutes and records of the grand jury so that they might properly prepare certain pleas in abatement and bar. (These pleas are later discussed.) The relief sought by these petitions was denied. In our view, it is not necessary to relate in detail the contents of these petitions, as we believe the court correctly ruled thereon. No authorities are cited by the defendants in support of their claimed right in this respect. On the other hand, there are numerous authorities where such procedure has been condemned. United States v. Garsson, D.C., 291 F. 646, 649; Metzler v. United States, 9 Cir., 64 F.2d 203, 206; Cox v. Vaught, 10 Cir., 52 F.2d 562. We agree with the authorities generally that the granting of such request would dangerously impair our system of grand jury procedure. It would open the way for an exploratory expedition for the purpose of obtaining the Government's evidence, and pave the way for numerous dilatory tactics. We think that the court properly denied such petitions.

On November 15, 1939, there was filed by Molasky, abatement pleas Nos. 1 and 2; on the same date, similar pleas by Kruse and Kruse, and also by the defendants Ragen and Ragen, as well as other defendants, not now before the court. In the first of these pleas, it is claimed the indictment is void for the reason that three special assistants to the Attorney General were, without authority, present before the grand jury during the course of the proceedings. The District Court found there was no merit in this plea, and we agree. Hale v. United States, 10 Cir., 25 F.2d 430, 435; United States v. Amazon Industrial Chemical Corp., D.C., 55 F.2d 254, 258. The second plea attacked the authority of three other special assistants on the ground that, although they were concededly authorized to appear before the grand jury, their authority was limited to investigating offenses arising under the revenue laws. It is alleged, however, that these assistants also participated in the investigation which resulted in the return of the fifth count of the indictment, charging conspiracy to violate the revenue laws. We are of the view that the contention of the defendants in this respect is also without merit. It requires little argument, and no citation of authorities to convince us that the proceedings of a grand jury are not invalidated because of the presence of assistants to the Attorney General au-

thorized to conduct an investigation of certain substantive offenses, merely because, during such investigation, evidence may be brought to light concerning the same subject matter of the investigation and which later results in the return of a conspiracy indictment.

We have studied the merits of these abatement pleas and discussed them briefly, even though we have serious doubts that they are a proper subject for our review. Title 28, U.S.C.A., § 879, in connection with § 861b, appears to preclude a reversal by this court "for error in ruling any plea in abatement, other than a plea to the jurisdiction of the court, or for any error in fact." Without discussing our province in this respect, we refer to McHie v. McHie, 7 Cir., 78 F.2d 351, a decision of this court, wherein these provisions are discussed and interpreted. It appears that the instant plea did not attack the jurisdiction of the court, and unless so, according to this holding, there is no right of review.

On January 10, 1940, there was filed on behalf of Molasky, a special immunity plea in bar. On the same date, a similar plea was filed by Ragen, Jr. On April 1, 1940, an amended plea in bar was filed by Molasky. To these pleas the Government filed a motion to dismiss, which was allowed. It is to be remembered that while the indictment in the instant case was returned August 22, 1939, the grand jury was a continuation from the June Term. This grand jury is referred to as the June Income Tax Grand Jury. There was impaneled in July a grand jury, charged with investigation of violations of the Sherman Anti-Trust Act, referred to as the Anti-Trust Grand Jury.

We shall first consider Molasky's amended plea. Stating the allegations in a form as abbreviated as the circumstances will permit, it alleges, in substance, that he was served both with a personal subpoena and a subpoena duces tecum, commanding him to appear and testify in behalf of the United States before the Anti-Trust Grand Jury, and to produce certain documents and records of Consensus; that after appearing before said grand jury, and after he had been sworn and testified concerning his name and address, claimed the constitutional privilege against testifying to anything that might tend to incriminate him personally, and refused to answer all questions unless granted immunity from prosecution. Whereupon, it alleges that an assistant to the Attorney General of the United States, in charge of such grand jury, proceedings, stated in the presence of, and to the grand jury, that the defendant was granted immunity on all matters and questions put to him by or before said grand jury, and that such immunity would apply to any and all matters, transactions and things as to which he might testify. The plea further alleges that after the granting of such immunity, he was required to testify and produce evidence in his possession, and that he gave oral testimony relating to, and proving, the following transactions, matters and things, among others:[1] The facts and transactions leading up to the organization and incorporation of Consensus, transactions with reference to the capital stock and ownership of the same during the years described in the indictment, the employment contracts with reference to commissions and salaries to be paid by Consensus to Molasky and other defendants, the payments of commissions and salaries by Consensus, and to whom, and the duties performed by each of said defendants in behalf of Consensus; expenses and commissions paid by Consensus, dividends paid by Consensus, and tax returns made by Consensus. It alleges, with reference to each of these matters and things, that the testimony given had to do with the years mentioned in the indictment. It further alleges with reference to these matters and things that Molasky was compelled to give answers and to produce evidence relating to and tending to connect him with the allegations of the instant indictment, and thereby disclosed to the grand jury information material and relevant to the transactions, matters and things alleged against him in the indictment and every count thereof, and that the matters and things concerning which such testimony was given, proved, or tended to prove, material allegations of said indictment, and constituted necessary links in a chain of evidence necessary to establish guilt.

The Immunity Statute, contained in the Anti-Trust laws of the United States, Title 15, § 32, U.S.C.A. reads, so far as here material, as follows: "Immunity of wit-

---

[1] To conserve space, we do not set forth such matters and things in their entirety, but only in abbreviated form.

ness. No person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under sections 1 to 27, inclusive, of this chapter: * * *."

The privilege against self-incrimination, found in the Fifth Amendment to the Constitution of the United States, provides: "No person shall * * * be compelled in any Criminal Case to be a witness against himself, * * *."

One of the early cases dealing with the question of immunity is that of Counselman v. Hitchcock, 142 U.S. 547, on page 586, 12 S.Ct. 195, on page 206, 35 L.Ed. 1110, wherein the court, in discussing the requirements of such an act, said: "* * * In view of the constitutional· provision, the statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. * * *"

A similar immunity statute, contained in the Interstate Commerce Act, was held valid in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819, for the reason that the provision afforded a complete and unlimited immunity, and was, therefore, a valid substitute for the constitutional privilege.

The District Court, in dismissing the plea, stated: "A plea of immunity under the statute in question, which merely states that a witness testified concerning certain matters is not sufficient. The plea should state the substance of the testimony given by the witness and should show by apt averment of fact that, if it were not for the immunity statute the witness could have invoked the constitutional privilege of silence."

▮ We are of the opinion that this view of the court imposes a requirement upon the pleader of a higher degree than is contemplated by the statute, notwithstanding the Government's contention to the contrary. The Government in its brief, states: "The plea simply alleges that the defendant gave testimony 'concerning' or 'relating to and directly proving' certain transactions, matters and things. But the pleas nowhere set out what facts were testified to in connection with these transactions, matters and things." The plea alleges, however, that the defendant's oral testimony was concerning, relating to and directly proving such matters and things. As will be subsequently disclosed in this opinion, the matters and things concerning which Molasky was required to testify, as alleged in his plea, were matters and things which constitute the main issues in this case insofar as its merits are concerned. Briefly mentioning a few of them, they are—who owned the. stock in Concensus, to whom and for what purpose were the deductions in controversy paid, and, still more important, the issue as to whether such deductions were dividends and, therefore, improperly deducted, or commissions for services rendered. These are some of the matters and things about which Molasky was required to testify before the Grand Jury. How can it be said that testimony regarding such matters and things was not pertinent to, and directly connected with, the charge with which Molasky was subsequently confronted? Surely it should not be held that one who pleads in bar is required to allege, in question and answer form, the testimony as given. To do so would come near to annihilating the immunity statute, as well as the constitutional privilege by which a person is protected from giving testimony.

▮▮ But it is argued by the Government that the matters alleged have nothing to do with tax evasion and, therefore, are not the subject-matter of immunity. As pointed out, however, the question as to who owned the stock in the corporation, and whether the claimed deductions were commissions or dividends, were essential matters about which the controversy largely revolved. It is also argued that there is no allegation in the plea that the evidence heard before the Anti-Trust Grand Jury was considered by the Income-tax Grand Jury. We do not think such an allegation is necessary. The application of the immunity provision is dependent upon how the information is obtained rather than the use to be made of it thereafter. Furthermore, the testimony thus obtained was available to the Government on the trial and, in fact, appears to have been utilized. It is further argued that there is nothing in the plea to disclose that. the Income-Tax Grand Jury did not obtain from other sources the information given to the Anti-Trust Grand Jury by Molasky. Neither do we think this allegation was necessary. Again, in our opinion, the

language of the immunity provision leaves no room for such construction.. As was said in Doyle v. Hofstader, 257 N.Y. 244, 177 N.E. 489, on page 493, 87 A.L.R. 418, in an opinion by Justice Cardozo:

"A witness is not required to show, in order to make his privilege available, that the testimony which he declines to give is certain to subject him to prosecution, or that it will prove the whole crime, unaided by testimony from others. It is enough, to wake the privilege into life, that there is a reasonable possibility of prosecution, and that the testimony, though falling short of proving the crime in its entirety, will prove some part or feature of it, will tend to a conviction when combined with proof of other circumstances which others may supply."

The contention that the plea is not sufficiently specific, in stating Molasky's grand jury testimony, places the Government in a rather awkward position. It must be remembered that the detailed testimony of a witness before a grand jury is in the possession of the Government and not the witness. That situation is well illustrated in the instant case. Molasky and some of the other defendants attempted by petition to obtain the minutes of the grand jury so that they might determine the propriety of a plea in bar. We have held that this request was properly denied. It is our view, however, when the instant plea in bar was presented, that the Government should have been required to take issue thereon. It had possession of the grand jury minutes, and it alone was in a position to disclose any misrepresentation in the plea. In no other manner could the assertions contained in the plea be dispelled.

The difficulty confronting a witness in framing a plea in bar is discussed in Hale v. Henkel, 201 U.S. 43, 68, 26 S.Ct. 370, 376, 50 L.Ed. 652. The court said: "The suggestion that a person who has testified compulsorily before a grand jury may not be able, if subsequently indicted for some matter concerning which he testified, to procure the evidence necessary to maintain his plea, is more fanciful than real. * * *"

After discussing how the evidence may be obtained, the court said: "* * * It is scarcely possible that all of them would have forgotten the general nature of his incriminating testimony * * *."

It appears the Court had in mind that the pleader need only allege the general nature of the testimony given by the witness.

The Court below, in dismissing this plea, and the Government here in support of the Court's action, place much stress upon Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128. We think this case is clearly distinguishable and has very little, if any, application to the instant situation. There the witness was required to produce before the grand jury certain records of the American Sugar Refining Company. The testimony was largely, if not entirely, concerned with the records and books of the corporation. In that case, issue was joined upon the immunity plea, a trial had thereon, and the court directed a verdict for the Government. In sustaining this action, the court, 227 U.S. on page 143, 33 S.Ct. on page 228, 57 L.Ed. 450, Ann.Cas.1914C, 128, said: ."The evidence did not concern any matter of the present charge. Not only was the general subject of the former investigation wholly different, but the specific things testified to had no connection with the facts now in proof much closer than that all were dealings of the same sugar company. * * *"

As pointed out, the matters and things about which Molasky testified were directly connected with and formed an essential link, if not the entire chain of circumstances relied upon for conviction.

■ Nor do we think that the corporate exception to the immunity provision is applicable. The plea alleges that he gave oral testimony concerning his personal knowledge of the matters and things described. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D, 558, Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, United States v. Goldman, D.C., 28 F.2d 424. We are of the opinion, therefore, that the Court erred in dismissing this plea.

The special plea in bar filed by the defendant, James M. Ragen, Jr., also claimed immunity. The disclosures of the plea with reference to the grand jury before whom he testified, and the granting of immunity, are substantially the same as those made in the plea of Molasky. It alleged that the defendant gave oral testimony before said grand jury "describing his relations in connection with the Consensus Publishing Company, Moses L. Annenberg, William Molasky, and James M. Ragen," and testified fully and stated all

facts within his knowledge concerning the "said Consensus Publishing Company and this defendant's connection therewith, and salaries and commissions received by him from, and services performed by him, for said Company." Other allegations more general in their nature are to the effect that the testimony which he was required to give was material and relevant to the matters alleged in the indictment. While the allegations of this plea as to the matters and things concerning which he was required to testify are not as complete as those contained in Molasky's plea, yet we think they are sufficient, and what we have said concerning Molasky's plea is applicable to Ragen's. It follows that the court, in our opinion, also erred in dismissing this plea.

This brings us to a consideration of the case on its merits. Notwithstanding that we have held that dismissal of the immunity pleas of Molasky and James M. Ragen, Jr. was erroneous, we shall treat the case on its merits as it concerns all of the defendants.

It becomes material to make a further statement concerning the facts. The record is voluminous and contains several hundred exhibits, which makes it difficult, if not impossible, to state the relevant facts within any reasonable limitation.

At or about the date of the return of the instant indictment, several other indictments were returned against the defendants and others, most of which charged offenses closely related to those of the present case. In all of these indictments, one of the defendants was Moses L. Annenberg, who appears to have been a leader in the activities concerned in the charge on which the defendants were convicted. Annenberg entered a plea of guilty on another charge, and in conformity with a stipulation made by the Government, the indictment against him in the instant case, and in other cases, was dismissed. None of the defendants in the trial below testified or offered any testimony in his own behalf. The testimony, therefore, was all given by Government witnesses, with the exception of one who was called by the Court at the instance of the Government.

The evidence discloses that in 1929, at the suggestion of Annenberg, it was agreed among him, Kruse, Ragen, Sr., and Molasky that they would take over and operate the business of manufacturing and distributing a card known as a "Run Down Sheet" which, prior thereto, had been distributed by Molasky and a St. Louis party by the name of Sweig. On September 18, 1929, Kruse organized an Illinois corporation known as the "Consensus Publishing Company." There were issued 100 shares of stock of the value of $5,000. The stock was issued as follows:

Howard Clark ................. 20 shares
Thomas Ryan ................. 20 shares
William Molasky ............. 30 shares
Jules Taylor ................. 30 shares

There was in existence at that time the Cecelia Investment Company (hereinafter referred to as "Cecelia"), a holding company for Annenberg's stock in a large number of corporations. On October 1, 1929, Taylor's 30 shares were re-issued to the Cecelia Company. On June 3, 1933, Molasky's 30 shares were re-issued, 15 shares to Molasky and 15 shares to B. Hoffman, his niece, and about April 9, 1935, Clark's 20 shares were reissued to one Herbert S. Kamin, an attorney and nephew of Annenberg. The shares issued to Ryan appear to have been subsequently issued to Ragen, Sr., although this is disputed. At any rate it can be said that Clark, Ryan and Taylor were mere dummy stockholders. So far as we are able to discern nothing of value was paid for any of the stock. The defendants contend as a matter of fact that none of the stock at any time was owned by them, that it was issued to them by mistake, and that it was always intended to have been issued in its entirety to Cecelia.

The business of Consensus was operated by Molasky in St. Louis where he lived and had his principal office. The business spread and was operated in Cincinnati, Kansas City, Louisville, Lexington, East St. Louis, Dayton, Columbus and other cities. He also was engaged in the distribution of various newspapers and periodicals published by Annenberg with whom he was associated. During the indictment period Arnold W. Kruse was the general manager of the Daily Racing Form Publishing Company, which Company was located in Chicago, the stock of which was held by Cecelia on behalf of Annenberg, and which published the Racing Form. Consensus, however, had its principal office and place of business in Chicago where Kruse and Ragen were located. James M. Ragen was the general manager of the General News Bureau which collected information, at different race tracks throughout the country,

used by bookmakers in connection with the run-down sheets in paying bets on horses.

As stated, the business of Consensus was conducted by Molasky in St. Louis in connection with Arnold W. Kruse, James M. Ragen, and their sons, Lester A. Kruse and James M. Ragen, Jr., in Chicago. The collections comprising the gross income, shown by Consensus in the income tax returns in question, were received through the St. Louis office. Molasky prepared two weekly statements, one showing the amount of collections which he deposited in the name of Consensus in a St. Louis bank, the other the expenses incurred in the St. Louis office, which statements were forwarded to the Chicago office. In the Chicago office there were bookkeepers and stenographers who transcribed the statements furnished by Molasky upon what were called work sheets, and made entries of such transactions on the books of Consensus, consisting of a journal, cash book, and general ledger. These books of Consensus disclosed the gross income as contained in the reports prepared by Molasky, and also the gross income in the exact amount as reported in the income tax returns.

The return filed in 1934 for the taxable year 1933 is typical. The figures for that year have heretofore been set forth in connection with our discussion of the indictment. Each week there was sent from the Chicago office to Molasky in St. Louis a check for expenses incurred. For the year 1933, these amounted to the sum of $38,-789.15, which included large items for salaries, wages, and expenses. The total of these items, it is conceded by the Government—in fact it is so charged in the indictment—was properly deductible. None of these items, however, includes any compensation or salary for any of the defendants in this suit. We are unable to determine to a certainty, but we are of the opinion that they do not include any salaries or expenses for bookkeepers or office help in the Chicago office. At any rate there were distributed from the Chicago office weekly the net proceeds, the amount reported by Molasky less the money advanced him for expenses, in the following proportions: 30% to Cecelia, 30% to Molasky, 20% to A. W. Kruse, and 20% to J. M. Ragen. This statement must be modified to the extent that in 1931, James M. Ragen had his stock transferred to his son, James M. Ragen, Jr. to whom distribution was thereafter made, and in 1932, the distribution on account of the 20 shares of stock

held by Arnold W. Kruse was made to his wife, Alma Kruse until March 16, 1933, and thereafter to his son, Lester A. Kruse. Also for the years 1933–36, both inclusive, one-half of the amounts payable to Molasky were paid to B. Hoffman. All of these distributions were reported in the income tax returns of the individual recipients thereof and entered upon the books of Consensus. It was these distributions made by Consensus and received by the defendants, shown in the income tax return of Consensus as commissions and deducted as such, that constitute the basis for the charge of a willful attempt to evade income tax.

■ It is not the province of this Court to weigh the testimony but it is our duty to review the record with a view of ascertaining if the defendants had a fair trial upon the charge as alleged in the indictment. This is especially true in view of our conviction derived from a study of the record that the Government's case is not strongly supported. In fact we agree with the District Judge when he said in denying the motions for directed verdict: "I admit that I think this is a pretty weak case." The important matter for consideration is whether the case was tried and submitted to the jury on correct legal principles.

There are two outstanding propositions around which this controversy largely revolves,—one advanced by the Government that the defendants were the owners of the stock, and the other by the defendants that they rendered service to Consensus and were entitled to a lawful deduction in connection therewith. As to the first proposition it is denied by the defendants that they were owners of the stock. (Without entering into a discussion of the evidence in this respect it is sufficient to state that in our judgment the record justifies the conclusion that they were such owners.) The fact that the disbursements were made to the defendants in the same proportion as their stock holdings constitutes the Government's major argument that such disbursements were dividends. This does not necessarily follow. Austin v. United States, 5 Cir., 28 F.2d 677. In fact any presumption in this respect would be overcome by proof that services were rendered for which the disbursements were made or could have been made.

On the other hand, we think the major argument advanced by the defendants to the effect that services were rendered to

the corporation for which deductions might have been lawfully made is plainly disclosed. While the Government contends to the contrary, yet counsel for the Government in his opening statement to the jury said: "The defendants, Arnold W. Kruse and James M. Ragen had very little if anything to do in the operation of the company's business * * * William Molasky actually ran the business and did considerable work * * *." The trial judge was of the opinion that "some and perhaps all of the defendants" rendered services to Consensus and so stated during the argument on the motion for directed verdict. We think there is considerable testimony in the record of services rendered by Molasky, who was president of Consensus, as well as by Kruse Sr., and some evidence of services performed by the other defendants. There was no proof and no effort by the Government to show that the services disclosed constituted the total of those performed and no effort to show the reasonable value of such services.

It does not require a great deal of proof to be convincing that the executives, managers, and employees of a corporation which earned a gross income of $119,960.96 for the year 1933 (in some years the income was much greater) rendered services and were reasonably entitled to substantial salaries. In 1929, Consensus took over a business—if it can be thus dignified—that was a losing proposition, and made it a financial success. So far as is disclosed by this record, these defendants alone were responsible for that success. According to the Government's theory, no executive ability was displayed and no service rendered for which the defendants were entitled to compensation or salary. Such a theory is incredible.

Furthermore, defendants contend that there was an agreement in 1929, prior to the incorporation of Consensus, between them and Annenberg, that Cecelia should take 30% of the profits as the owner of the business, Molasky 30%, and Ragen, Sr. and Arnold Kruse each 20% as compensation for services in the operation of the company. There is testimony which sustains this contention. True, the Government argues that it is unbelievable, even though it came from Government witnesses. It appears to us, however, that the validity of such agreement is of little importance, and certainly not controlling. We should think that the defendants would impliedly

be entitled to compensation for services rendered irrespective of an express agreement relative thereto.

Under the Government's theory, however, it is immaterial and irrelevant as to whether the defendants performed services for which they might have been entitled to compensation or salary. The case was tried and is presented here on that theory. In other words, the Government argues that conceding the defendants rendered services for which they might have béen entitled to compensation, yet the disbursements were received as corporation dividends and were, therefore, unlawful deductions. Assuming there is evidence which sustains the contention that the disbursements were, on somé occasions, recognized as dividends, is that sufficient to show that the deductions were unlawful? The terms "dividends" and "commissions" appear to have been used interchangeably by the bookkeepers for Consensus on the work sheets and on the statements furnished the defendants each week. There is testimony, much stressed, that during the years 1932 to 1935, all the stock in Consensus was issued to Cecelia, the shares held by the various defendants and dummies destroyed and the so-called employment contracts executed and dated back to cover prior years since the organization of Consensus. This was done largely by Kamin (originally a defendant, lawyer, and nephew of Annenberg, dismissed out of the instant case) who worked under the supervision of Arnold W. Kruse. That these facts and circumstances strongly indicate that some sort of chicanery was in progress cannot be doubted. But its efficacy as proof that the defendants were evading the income tax of Concensus by charging as commissions that which they knew to be dividends, is difficult to discern. If the Government's theory is correct that the disbursements were made solely as dividends, notwithstanding the fact that services were rendered by the defendants, then we have the anomalous situation wherein the defendants willfully attempted to evade the tax by unlawfully claiming as deductions that which they could have lawfully claimed.

Another fact unfavorable to the Government is that each year during the indictment period, the return filed by Consensus, as well as the corporate books, plainly disclosed the gross income, admittedly correct, as well as the item of de-

duction now claimed to be unlawful. Not only that, the return disclosed how this item was divided among the various defendants. During the years in question, the auditors of the Revenue service, on numerous occasions, audited the returns and checked them with the corporation records. Such disclosure by the taxpayer, if intended as a plan of tax evasion, is consistent only with gross ignorance on the part of those who devised the plan. Whatever may be said of these defendants, we do not think they can be charged with such ignorance. Also the record discloses that B. Hoffman, to whom Molasky in 1933, assigned 15 shares of stock in Consensus, in her individual tax return for certain years, showed the money received from Consensus as dividends. The Revenue officials pointed out to her that she was in error in this respect and that such receipts must be shown as commissions. On this basis, an additional tax was assessed against her.

The Government in its brief and in oral argument before this Court asserts that the deductions in question must be treated either as dividends in their entirety, and if so as unlawful deductions, or as commissions in their entirety, and therefore properly deducted. In other words, in accordance with this argument there can be no middle ground. We agree with this argument for two reasons: First, it was directly alleged in the conspiracy count of the indictment and impliedly in the other counts that none of the defendants "rendered any services to the said corporation." Thus the question was directly in issue and the Government had the burden of establishing the affirmative. Second, it is a serious question whether a prosecution for income tax evasion, founded upon improper deductions, can succeed where the proof is other than that the deductions are improper in their entirety.

Section 23 (a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 23 (a) allows deductions in computing a net income for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *." The reported cases, dealing with criminal responsibility for tax evasion, are, so far as we are aware, predicated upon a failure to file a return, or if filing a return, failure to report the correct gross income. We find no case where the evasion charged was based upon an improper deduction. We have reached the conclusion that where a statute permits a reasonable deduction for services, a criminal prosecution can not be maintained by proof other than that such services were not rendered. It is not sufficient to allege or prove that a deduction claimed for services is unlawful because the amount charged is unreasonable. Such a charge would leave to the trier of the facts the responsibility for fixing the standard by which a defendant's guilt would be determined. The standard would vary according to the views of different courts and juries. Such a theory would be violative of the defendant's constitutional rights, and void. United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; International Harvester Co. v. Kentucky, 234 U.S. 216, 221, 34 S.Ct. 853, 58 L.Ed. 1284; Collins v. Kentucky, 234 U.S. 634, 638, 34 S.Ct. 924, 58 L. Ed. 1510.

The principle may be illustrated by reference to the deduction of $2000 allowed to a person as head of a family. Assume A is charged with attempting to evade his tax by claiming a deduction of $2,000 as head of a family, knowing that such is not the case. On a trial it develops that A is the head of a family. That of course would be fatal to the Government's case. Assume further that the statute provided a reasonable deduction for a person at the head of a family, taking into consideration the size of his family and station in life. That would be a deduction privilege somewhat similar to "a reasonable allowance for salaries or other compensation for personal services actually rendered." Assume, under a provision of this character, A was charged with tax evasion by claiming a deduction of a certain amount as the head of a family, knowing that such was not the case. The proof discloses that he is not the head of a family. He is, therefore, entitled to no deduction and could properly be convicted. Assume again, however, that the proof shows him to be the head of a family. We should think that would end the prosecution. The only question remaining would be the reasonableness of the deduction. That would be a matter concerning which honest individuals, as well as courts and juries, might differ. An unreasonable deduction by such an individual might form a valid basis for a civil suit but not for a criminal prosecution.

█ So it is in the instant case. The defendants are charged, necessarily we think, with causing an improper deduction in its entirety in the returns of Consensus. The proof shows without doubt that they rendered service to Consensus and were entitled to compensation therefor in the form of salary or otherwise. When that situation developed in the trial we are of the opinion that it should have proceeded no further. Of course it may be argued that it was still a jury question as to whether the deductions were dividends in their entirety or commissions for services rendered. Assuming without agreeing, that such is the case, we come to the alleged error of the Court in its charge to the jury which in part is as follows:

"* * * it is for you to decide whether these were, or whether a substantial portion thereof, was a distribution of profits rather than the compensation of employees.

"I use the words 'These sums or a substantial portion thereof.' It is not necessary for the government under this indictment to prove that all of the sums so distributed to these defendants were profits. * * * It is sufficient if you find beyond a reasonable doubt that the defendants intentionally diverted profits of this concern, in the amounts charged in the indictment or substantial parts thereof, diverted them from the form of profits and received them in the form of commissions. * * *"

█ The jury was thus advised in effect that in order to convict it was only necessary that a substantial portion of the profits of Consensus were distributed to the defendants as dividends. This statement was neither consistent with the indictment nor the theory upon which the case was tried. Furthermore, it clothed the jury with the right to determine what portions of the sums received by defendants were a distribution of profits and what portions were to be deemed reasonable compensation for services. If any portion of such sums was properly received as compensation for services then it is subject to the fatal objection that the jury was permitted to fix the standard. It is true that this particular portion of the charge appears less harmful when read in connection with the charge as a whole than when standing alone. Yet we do not agree that its harmful effect was eliminated by other portions of the charge. Who can say but that the jury might well have reasoned that the distributions made to the defendants were partly for services rendered and partly for profits in the form of dividends, but that the latter constituted a substantial portion and was, therefore, the guide by which they arrived at a verdict of guilty.

We have not overlooked the Government's argument that every means alleged in a conspiracy charge need not be proved. Here, however, there was only one means alleged and that was that the defendants caused Consensus to take a deduction as commissions when no services were rendered and with knowledge that the deductions were dividends or a division of profits.

In view of what we have said it follows that the judgments must be and are hereby reversed and the cause remanded.

KERNER, Circuit Judge (dissenting).

I am unable to concur in that part of the opinion holding that the District Court erred in instructing the jury.

The gist of the offense was the willful attempt to evade and defeat income taxes. Whether there was such a willful attempt in this case was the province of the jury to determine from the evidence. In passing upon the sufficiency of the proof, it is not our province to weigh or determine the credibility of the witnesses. We must take that view of the evidence most favorable to the appellee and sustain the verdict of the jury if there is substantial evidence to support it.

The record clearly discloses that Howard Clark was bookkeeper for the Consensus Company and that in keeping the books he took his instructions from Kruse, Sr., who told him to charge 30% of the net profits to Cecelia as dividends and the remaining 70% would be distributed to Molasky, Kruse Sr. and Ragen, Sr. as commissions.

The record also discloses that at the close of each week all of the profits remaining after the payment of the operating expenses were distributed weekly in proportion to the number of shares owned by the stockholders. The profits were called dividends on all of the work papers of the bookkeepers. While it is true that what they were styled by the defendants did not necessarily determine their character, nevertheless it was for the jury to say from all the evidence whether there was here a willful attempt to evade and defeat the just payment of income taxes. This the jury did. I believe there was ample proof

of acts and that the reasonable inferences flowing therefrom warranted the verdict that there was a willful attempt to evade the payment of income taxes.

The amount of the tax which it was charged was attempted to be evaded was not of the gist of the offense, Gleckman v. United States, 8 Cir., 80 F.2d 394, nor was it necessary that the Government prove an evasion of all the tax charge, Tinkoff v. United States, 7 Cir., 86 F.2d 868.

It is elementary that any specific given instruction must be considered in relation to the entire charge. The instructions were exceedingly fair and thorough, and when the entire charge is considered, it is clear the jury was distinctly called upon to decide whether the defendants entered into a scheme to willfully evade the payment of income taxes.

The judgment as to the appellants, James M. Ragen, Sr., Arnold W. Kruse and Lester A. Kruse, should be affirmed.